# 17-cv-1224-LGS

## United States District Court
*for the*
## Southern District of New York
———————————

LEHMAN BROTHERS SPECIAL FINANCING INC.,

*Appellant,*

—against—

BANK OF AMERICA NATIONAL ASSOCIATION, THE BANK OF NEW YORK MELLON NATIONAL ASSOCIATION, BNY MELLON CORPORATE TRUSTEE SERVICES LTD.,

*(Caption continued on the following pages)*
———————————

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK (CHAPMAN, J.)

IN RE: LEHMAN BROTHERS HOLDINGS INC., CASE NO. 08-13555, ADV. PROC. NO. 10-03547

---

## BRIEF FOR THE APPELLANT

---

William A. Maher
Paul R. DeFilippo
William F. Dahill
Vincent T. Chang
Mara R. Lieber
Nicholas G. Veliky
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
(212) 382-3300
wmaher@wmd-law.com
pdefilippo@wmd-law.com
wdahill@wmd-law.com
vchang@wmd-law.com
mlieber@wmd-law.com
nveliky@wmd-law.com

*Counsel for Appellant Lehman Brothers
Special Financing Inc.*

Thomas E. Hommel
LEHMAN BROTHERS HOLDINGS INC.
1271 Avenue of the Americas
New York, New York 10020
(646) 285-9000
thomas.hommel@lehmanholdings.com

*Counsel for Appellant Lehman Brothers
Special Financing Inc. against AIG, Inc. and
AIG Taiwan Insurance Co. Ltd.*

CITIBANK, N.A., U.S. BANK NATIONAL ASSOCIATION, U.S. BANK TRUST NATIONAL
ASSOCIATION, WELLS FARGO BANK NATIONAL ASSOCIATION,

*Trustee Defendants-Appellees,*

801 GRAND CDO SPC, F/A/O THE SERIES 2006-1, AS ISSUER, 801 GRAND CDO SERIES 2006-1
LLC, AS CO-ISSUER, 801 GRAND CDO SPC, F/A/O THE SERIES 2006-2, AS ISSUER, 801 GRAND
CDO SERIES 2006-2 LLC, AS CO-ISSUER, ALTA CDO SPC, F/A/O THE SERIES 2007-1
SEGREGATED PORTFOLIO, AS ISSUER, ALTA CDO LLC, FOR SERIES 2007-1, AS CO-ISSUER, ALTA
CDO SPC, F/A/O THE SERIES 2007-2 SEGREGATED PORTFOLIO, AS ISSUER, ALTA CDO LLC, FOR
SERIES 2007-2, AS CO-ISSUER, BARTON SPRINGS CDO SPC, F/A/O THE SERIES 2005-1
SEGREGATED PORTFOLIO, AS ISSUER, BARTON SPRINGS CDO SERIES 2005-1 LLC, AS CO-ISSUER,
BARTON SPRINGS CDO SPC, F/A/O THE SERIES 2005-2 SEGREGATED PORTFOLIO, AS ISSUER,
BARTON SPRINGS CDO SERIES 2005-2 LLC, AS CO-ISSUER, BLUE POINT CDO SPC, F/A/O THE
SERIES 2005-1 SEGREGATED PORTFOLIO, AS ISSUER, BLUE POINT CDO SERIES 2005-1 LLC, AS
CO-ISSUER, CHERRY HILL CDO SPC, F/A/O THE SERIES 2007-1 SEGREGATED PORTFOLIO, AS
ISSUER, CHERRY HILL CDO LLC FOR SERIES 2007-1, AS CO-ISSUER, CHERRY HILL CDO SPC,
F/A/O THE SERIES 2007-2 SEGREGATED PORTFOLIO, AS ISSUER, CHERRY HILL CDO LLC FOR
SERIES 2007-2, AS CO-ISSUER, COPPER CREEK CDO SPC, F/A/O SERIES 2007-1 SEGREGATED
PORTFOLIO, AS ISSUER, COPPER CREEK CDO LLC, AS CO-ISSUER, CROWN CITY CDO 2005-1
LIMITED, AS ISSUER, CROWN CITY CDO 2005-1 LLC, AS CO-ISSUER, CROWN CITY CDO 2005-2
LIMITED, AS ISSUER, CROWN CITY CDO 2005-2 LLC, AS CO-ISSUER, FREEDOM PARK CDO SERIES
2005-1 LIMITED, AS ISSUER, FREEDOM PARK CDO SERIES 2005-1 LLC, AS CO-ISSUER,
FULLERTON DRIVE CDO LIMITED, AS ISSUER, FULLERTON DRIVE CDO LLC, AS CO-ISSUER,
GREYSTONE CDO SPC, F/A/O THE SERIES 2006-1 SEGREGATED PORTFOLIO, AS ISSUER,
GREYSTONE CDO SERIES 2006-1 LLC, AS CO-ISSUER, GREYSTONE CDO SPC, F/A/O THE SERIES
2006-2 SEGREGATED PORTFOLIO, AS ISSUER, GREYSTONE CDO SERIES 2006-2 LLC, AS CO-
ISSUER, JEFFERSON VALLEY CDO SPC, F/A/O THE SERIES 2006-1 SEGREGATED PORTFOLIO, AS
ISSUER, JEFFERSON VALLEY CDO SERIES 2006-1 LLC, AS CO-ISSUER, KINGS RIVER LIMITED, AS
ISSUER, KINGS RIVER LLC, AS CO-ISSUER, LAKEVIEW CDO SPC, F/A/O THE SERIES 2007-1
SEGREGATED PORTFOLIO, AS ISSUER, LAKEVIEW CDO LLC SERIES 2007-1, AS CO-ISSUER,
LAKEVIEW CDO SPC, F/A/O THE SERIES 2007-2 SEGREGATED PORTFOLIO, AS ISSUER, LAKEVIEW
CDO LLC, F/A/O THE SERIES 2007-2 SEGREGATED PORTFOLIO, AS CO-ISSUER, LAKEVIEW CDO
SPC, F/A/O THE SERIES 2007-3 SEGREGATED PORTFOLIO, AS ISSUER, LAKEVIEW CDO LLC, F/A/O
THE SERIES 2007-3 SEGREGATED PORTFOLIO, AS CO-ISSUER, PANTERA VIVE CDO SPC, F/A/O THE
SERIES 2007-1, AS ISSUER, PANTERA VIVE CDO LLC, AS CO-ISSUER, PEBBLE CREEK LCDO 2007-
2, LTD., AS ISSUER, PEBBLE CREEK LCDO 2007-2, LLC, AS CO-ISSUER, PENN'S LANDING CDO
SPC, F/A/O THE SERIES 2007-1 SEGREGATED PORTFOLIO, AS ISSUER, PENN'S LANDING CDO LLC,
AS CO-ISSUER, PYXIS ABS CDO 2007-1 LTD., AS ISSUER, PYXIS ABS CDO 2007-1 LLC, AS CO-
ISSUER, QUARTZ FINANCE PLC, SERIES 2004-1, AS ISSUER, RESTRUCTURED ASSET CERTIFICATES
WITH ENHANCED RETURNS, SERIES 2005-21-C TRUST, AS ISSUER, RESTRUCTURED ASSET
CERTIFICATES WITH ENHANCED RETURNS, SERIES 2006-1-C TRUST, AS ISSUER, RESTRUCTURED
ASSET CERTIFICATES WITH ENHANCED RETURNS, SERIES 2007-4-C TRUST, AS ISSUER, RUBY
FINANCE PLC, F/A/O THE SERIES 2005-1, CLASS A2-A9, AS ISSUER, SECURITIZED PRODUCT OF

RESTRUCTURED COLLATERAL LIMITED SPC, F/A/O THE SERIES 2007-1 FEDERATION A-1 SEGREGATED PORTFOLIO, AS ISSUER, SECURITIZED PRODUCT OF RESTRUCTURED COLLATERAL LIMITED SPC, F/A/O THE SERIES 2007-1 FEDERATION A-2 SEGREGATED PORTFOLIO, AS ISSUER, SOLAR V CDO SPC, F/A/O THE SERIES 2007-1 SEGREGATED PORTFOLIO, AS ISSUER, SOLAR V CDO LLC, AS CO-ISSUER, STOWE CDO SPC, F/A/O THE SERIES 2006-1 SEGREGATED PORTFOLIO, AS ISSUER, STOWE CDO SERIES 2006-1 LLC, AS CO-ISSUER, STOWE CDO SPC, F/A/O THE SERIES 2008-2A SEGREGATED PORTFOLIO, AS ISSUER, STOWE CDO LLC, AS CO-ISSUER, SUNSET PARK CDO LIMITED SPC, F/A/O THE SERIES 2004-1 SEGREGATED PORTFOLIO, AS ISSUER, SUNSET PARK CDO LIMITED SPC, F/A/O THE SERIES 2004-2 SEGREGATED PORTFOLIO, AS ISSUER, SUNSET PARK CDO LIMITED SPC, F/A/O THE SERIES 2004-4 SEGREGATED PORTFOLIO, AS ISSUER, SUNSET PARK CDO LLC, AS CO-ISSUER, SUNSET PARK CDO-M LIMITED SPC, F/A/O THE SERIES 2005-3 SEGREGATED PORTFOLIO, AS ISSUER, SUNSET PARK CDO-M LLC, AS CO-ISSUER, SUNSET PARK CDO LIMITED SPC, F/A/O THE SERIES 2005-5 SEGREGATED PORTFOLIO, AS ISSUER, SUNSET PARK CDO SERIES 2005-5 LLC, AS CO-ISSUER, SUNSET PARK CDO SERIES 2005-6 LIMITED, AS ISSUER, SUNSET PARK CDO SERIES 2005-6 LLC, AS CO-ISSUER, SECURITIZED PRODUCT OF RESTRUCTURED COLLATERAL LIMITED SPC, F/A/O THE SERIES 2007-1 TABXSPOKE (07-1 40-100) SEGREGATED PORTFOLIO, AS ISSUER, SERIES 2007-1 TABXSPOKE (07-1 40-100) LLC, AS CO-ISSUER, TAVARES SQUARE CDO LIMITED, AS ISSUER, TAVARES SQUARE CDO LLC, AS CO-ISSUER, VOX PLACE CDO LIMITED, AS ISSUER, VOX PLACE CDO LLC, AS CO-ISSUER,

*Issuer Defendants-Appellees,*

– AND –

AIG, INC., AIG TAIWAN INSURANCE CO. LTD., ANZ INVESTMENT BANK, ANZ NOMINEES LIMITED, ATLANTIC CENTRAL BANKERS BANK, BALMORAL AUSTRALIA PTY LTD, BANCO CREDITO DEL PERU, BANK OF AMERICA NATIONAL ASSOCIATION, THE BANK OF NEW YORK MELLON, LONDON BRANCH, THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A., BASIS CAPITAL PTY LIMITED, BASIS PAC- RIM OPPORTUNITY FUND LTD., BELMONT PARK INVESTMENTS PTY LTD, BIG HORN CDO 2007-1 COLLATERAL, BLUE MOUNTAINS CITY COUNCIL, BNY MELLON CORPORATE TRUSTEE SERVICES LTD., BRODERICK CDO 3, LTD., CARROLL 2 CC/CARROLL HOLDINGS COMPANY AND/OR THE HOLDERS OF AN ACCOUNT IN THAT NAME, CATHOLIC DEVELOPMENT FUND FOR THE CATHOLIC DIOCESE OF BATHURST, CHEYNE CLO INVESTMENTS I LTD., CITIBANK, N.A., CITICORP NOMINEES PTY LTD., CITIGROUP GLOBAL MARKETS, INC., CITY OF ALBANY, CITY OF SWAN, CLASS V FUNDING III, CORP., CLASS V FUNDING III, LTD., CONTINENTAL LIFE INSURANCE COMPANY OF BRENTWOOD TENNESSEE, COUNTRY LIFE INSURANCE COMPANY, CREDIT SUISSE SECURITIES (EUROPE) LTD., CREDIT SUISSE SECURITIES (USA) LLC, DEUTSCHE BANK TRUST COMPANY AMERICAS, DIVERSEY HARBOR ABS CDO, INC., DIVERSEY HARBOR ABS CDO, LTD., EASTERN METROPOLITAN REGIONAL COUNCIL, ELLIOTT INTERNATIONAL, L.P., EUROMERICA ASESORIAS S.A., EUROCLEAR BANK S.A./N.V., FIRST NORTHERN BANK AND TRUST COMPANY, LOWER MURRAY WATER, FULTON STREET CDO CORP., G & F YUKICH SUPERANNUATION PTY LTD, GARADEX INC., GATEX PROPERTIES INC., GENERAL SECURITY NATIONAL INSURANCE, GENWORTH LIFE AND ANNUITY INSURANCE CO., GEOMETRIC ASSET FUNDING LTD., GOLDMAN, SACHS & CO., GOLDMAN SACHS INTERNATIONAL, GOSFORD CITY COUNCIL, GUOHUA LIFE INSURANCE CO., LTD., HAVENROCK II LIMITED, HHE PARTNERSHIP

LP, JP MORGAN CHASE BANK, NATIONAL ASSOCIATION, JP MORGAN SECURITIES, PLC, KLIO II FUNDING CORP., KLIO II FUNDING LTD., KLIO III FUNDING CORP., KLIO III FUNDING LTD., KMCL CARROLL AND/OR THE HOLDERS OF AN ACCOUNT IN THAT NAME, LANCER FUNDING II LTD., LANCER FUNDING II, LLC, LEETON SHIRE COUNCIL, LEITHNER & COMPANY PTY. LTD, LGT BANK IN LIECHTENSTEIN, LTD., LIFEPLAN AUSTRALIA FRIENDLY SOCIETY LTD., THE LIVERPOOL LIMITED PARTNERSHIP, LORELEY FINANCING (JERSEY) NO. 15 LIMITED, LYNDOCH LIVING INC., MAGNETAR CONSTELLATION FUND II LTD., MAGNETAR CONSTELLATION MASTER FUND III LTD., MAGNETAR CONSTELLATION MASTER FUND LTD., MANLY COUNCIL, MARINER LDC, MARSH & MCLENNAN MASTER RETIREMENT TRUST, MARSH & MCLENNAN COMPANIES, INC. STOCK INVESTMENT PLAN, MBIA, INC., MODERN WOODMEN OF AMERICA, INC., MONEYGRAM SECURITIES LLC, MORGAN STANLEY & CO., INCORPORATED, MORGANS FINANCIAL LIMITED, MULBERRY STREET CDO, LTD., NATIONAL NOMINEES LIMITED, NATIONWIDE HYBRID MAND/NATIONWIDE SF HYBRID AND/OR THE HOLDERS OF AN ACCOUNT IN THAT NAME, NATIONWIDE SUPERANNUATION AND/OR THE HOLDERS OF AN ACCOUNT IN THAT NAME, NATIXIS FINANCIAL PRODUCTS LLC, NEWCASTLE CITY COUNCIL, OHIO PUBLIC EMPLOYEE RETIREMENT SYSTEM, OSDF, LTD., OVERSEAS PROPERTY INVESTMENT CORPORATION, PANORAMA RIDGE PTY LTD, PARKES SHIRE COUNCIL, PCA LIFE ASSURANCE CO. LTD., PHL VARIABLE INSURANCE COMPANY, PHOENIX LIFE INSURANCE COMPANY, PINNACLE POINT FUNDING LTD., PINNACLE POINT FUNDING CORP., PRINCIPAL LIFE INSURANCE COMPANY,  PUTNAM DYNAMIC ASSET ALLOCATION FUNDS – GROWTH PORTFOLIO, PUTNAM INTERMEDIATE DOMESTIC INVESTMENT GRADE TRUST, PUTNAM STABLE VALUE FUND, RGA REINSURANCE CO., SBSI, INC., SCOR REINSURANCE COMPANY, SECURITY BENEFIT LIFE INSURANCE CO., SENTINEL MANAGEMENT GROUP INC., SHENANDOAH LIFE INSURANCE COMPANY, SHINHAN BANK, SMH CAPITAL ADVISORS, INC., ST. VINCENT DE PAUL SOCIETY QUEENSLAND, STABFUND SUB CA AG, STANDARD LIFE INSURANCE COMPANY OF INDIANA, STANTON ABS I P.L.C., STANTON CDO I SA, STARLING STRATEGIES LTD., STATE STREET GLOBAL ADVISORS, STATE STREET BANK AND TRUST COMPANY, STATE STREET INTERNATIONAL IRELAND LIMITED, STRATEGIC GLOBAL (PUTNAM) MANAGED TRUST, STICHTING SHELL PENSIOENFONDS, STRUCTURED CREDIT OPPORTUNITIES FUND II, LP, SUSQUEHANNA BANK, TERWIN CAPITAL, LLC, TIERRA ALTA FUNDING I LTD., TIERRA ALTA FUNDING I, CORP., TOPDANMARK EDB A/S, TRICADIA CREDIT STRATEGIES MASTER FUND, LTD., U.S. BANK NATIONAL ASSOCIATION, UNICREDIT BANK AG, LONDON BRANCH, UNITING CHURCH IN AUSTRALIA PROPERTY TRUST (SA), VALEO INVESTMENT GRADE CDO LTD., WELLS FARGO BANK, NATIONAL ASSOCIATION, WHITEHAWK CDO FUNDING, LLC, WHITEHAWK CDO FUNDING, LTD., THE WINTER GROUP, ZAIS INVESTMENT GRADE LIMITED II, ZAIS INVESTMENT GRADE LIMITED V, ZAIS INVESTMENT GRADE LIMITED X, INDIVIDUALLY AND AS REPRESENTATIVES OF ALL OTHERS SIMILARLY SITUATED,

*Noteholder Defendants-Appellees*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Bankruptcy Procedure 8012, the undersigned counsel for the Appellant in the above captioned action certifies that the following are corporate parents and/or publicly held corporations owning 10% or more of the stock of the Plaintiff:

Appellant Lehman Brothers Special Financing Inc. is more than 10% owned by Lehman Brothers Holdings, Inc.

## **<u>TABLE OF CONTENTS</u>**

<u>Page</u>

JURISDICTIONAL STATEMENT ...........................................................1

PRELIMINARY STATEMENT ................................................................1

STATEMENT OF ISSUES PRESENTED..................................................6

STATEMENT OF THE CASE...................................................................7

    I.      FACTUAL BACKGROUND ............................................7

          A.      LBSF and the Issuers Enter into Swap Agreements that Protect LBSF from Risk in the Mortgage and Bond Markets ....7

          B.      The Trustees and the Issuers Enter into Indentures ..................9

    II.     PROCEDURAL BACKGROUND ....................................12

          A.      LBHI Files the Largest Ever Bankruptcy Case, Followed 18 Days Later by Its Wholly Owned Subsidiary LBSF.................................................................12

          B.      Earlier Decisions by Judge Peck Held that the Priority Provisions Are Unenforceable *Ipso Facto* Clauses and Are Not Protected by the § 560 Safe Harbors .........................13

          C.      The Bankruptcy Court Decision ...............................................15

SUMMARY OF ARGUMENT .................................................................15

ARGUMENT ...........................................................................................16

    I.      STANDARD OF REVIEW .............................................16

    II.     THE § 560 SAFE HARBOR IS NOT APPLICABLE ......................18

A. The Bankruptcy Court Improperly Extended § 560
to Cover "Ancillary" Acts Beyond the "Liquidation,
Termination, or Acceleration" of a Swap Agreement .............20

    1. The Bankruptcy Court Improperly Construed
the Word "Liquidation" as Used in § 560 ......................21

    2. The Bankruptcy Court's Decision is Inconsistent
with Prior Case Law and Congressional Intent .............25

B. The Bankruptcy Court Improperly Extended
§ 560 to Apply to Exercise of Rights of Parties
that Are Not Swap Participants or Financial Participants ........30

C. The Bankruptcy Court's Attempt to Distinguish Judge
Peck's Analysis in *BNY* and *Ballyrock* is Flawed ...................35

D. The Second Circuit Cases Cited by the
Bankruptcy Court for a Broad Interpretation of
Safe Harbors Did Not Involve § 560 and Are Inapposite.........39

III. ALL THE PRIORITY PROVISIONS ARE
UNENFORCEABLE *IPSO FACTO* CLAUSES ................................40

A. Minor Wording Differences Among the
Priority Provisions Had No Substantive Effect and
No Bearing on Whether the Provisions Are
*Ipso Facto* Clauses .................................................................41

B. The Bankruptcy Court's Holding that Modification
Occurred on Termination Misreads the Contracts...................45

C. The LBHI Petition Date is the Proper Date for the
Purposes of Application of the *Ipso Facto* Provisions
of the Code ..............................................................................48

    1. The LBHI Bankruptcy Filing is the Case After
Which Modification of Rights Were Prohibited ...........49

2.   As Judge Peck Previously Held, the LBHI and LBSF
Bankruptcy Filings Constituted a "Singular Event"
for Purposes of Application of the *Ipso Facto*
Provisions of the Code ..................................................50

IV.   LBSF'S STATE LAW CLAIMS SHOULD BE RESTORED ...........53

CONCLUSION .........................................................................................56

CERTIFICATE OF COMPLIANCE .......................................................58

# TABLE OF AUTHORITIES

**Case**                                                                                    **Page(s)**

*Anderson News LLC v. Am. Media, Inc.*,
    680 F.3d 162 (2d Cir. 2012) .........................................................................17

*Calpine Energy Servs., L.P. v. Reliant Energy Elec. Solutions, L.L.C. (In re Calpine Corp.)*,
    2009 WL 1578282 (Bankr. S.D.N.Y. May 7, 2009) ...............................20, 27

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
    750 F.3d 227 (2d Cir. 2014) ...................................................................44, 54

*Chambers v. Time Warner, Inc.*,
    282 F.3d 147 (2d Cir. 2002) .........................................................................17

*Chicago, R.I. & P. Ry. Co. v. Sturm*,
    174 U.S. 710 (1899)........................................................................................30

*Cincinnati Newspaper Guild, Local 9 v. Cincinnati Enquirer, Inc.*,
    863 F.2d 439 (6th Cir. 1988) ........................................................................43

*Cruz v. Leviev Fulton Club, LLC*,
    711 F. Supp. 2d 329 (S.D.N.Y. 2010) .........................................................30

*Dennis v. Higgins*,
    498 U.S. 439 (1991)........................................................................................30

*Deutsche Bank Nat'l Trust Co. v. Quicken Loans Inc.*,
    810 F.3d 861 (2d Cir. 2015) .........................................................................16

*DirecTV Latin Am., LLC v. RCTV Int'l Corp.*,
    115 A.D.3d 539 (1st Dep't 2014)..................................................................43

*DKR Capital, Inc. v. AIG Int'l W. Broadway Fund, Ltd.*,
    2003 WL 22283836 (S.D.N.Y. Oct. 2, 2003)...........................17, 18, 34, 38

*Drexel Burnham Lambert Prod. Corp. v. Midland Bank PLC*,
    1992 U.S. Dist. LEXIS 21223 (S.D.N.Y. Nov. 9, 1992) ..............................56

*Echelon Int'l Corp. v. Am. W. Airlines, Inc.*,
    85 F. Supp. 2d 313 (S.D.N.Y. 2000) ............................................................34

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*,
    651 F.3d 329 (2d Cir. 2011) ....................................................................6, 39

*F.D.I.C. v. Bank of N.Y.*,
    479 F. Supp. 2d 1 (D.D.C. 2007),
    *aff'd*, 508 F.3d 1 (D.C. Cir. 2007) ..............................................................41

*Fabozzi v. Lexington Ins. Co.*,
    601 F.3d 88 (2d Cir. 2010) ..........................................................................17

*Fenton v. Lipsius*,
    1969 WL 10910 (N.Y. Sup. Ct. Dec. 22, 1969) ..........................................38

*FTI Consulting, Inc. v. Merit Mgmt. Grp., LP*,
    830 F.3d 690 (7th Cir. 2016) ......................................................................39

*Giles v. City of New York*,
    41 F. Supp. 2d 308 (S.D.N.Y. 1999) ............................................................34

*Goodheart Clothing Co., Inc. v. Laura Goodman Enters., Inc.*,
    962 F.2d 268 (2d Cir. 1992) ..........................................................................7

*HBE Leasing Corp. v. Frank*,
    61 F.3d 1054 (2d Cir. 1995) ........................................................................55

*IBP, Inc. v. Alvarez*,
    546 U.S. 21 (2005)........................................................................................21

*In re Actrade Fin. Tech. Ltd.*,
    337 B.R. 791 (Bankr. S.D.N.Y. 2005) ........................................................54

*In re Am. Home Mortg., Inc.*,
    379 B.R. 503 (Bankr. D. Del. 2008)......................................................26, 36

*In re Amcor Funding Corp.*,
    117 B.R. 549 (D. Ariz. 1990) ......................................................................19

*In re Bernard L. Madoff Inv. Sec., LLC*,
   440 B.R. 243 (Bankr. S.D.N.Y. 2010) ...........................................................54

*In re Dow Corning Corp.*,
   215 B.R. 346 (Bankr. E.D. Mich. 1997)......................................................22

*In re Enron Corp.*,
   306 B.R. 465 (Bankr. S.D.N.Y. 2004) .........................................................19

*In re Herrera*,
   422 B.R. 698 (B.A.P. 9th Cir. 2010),
   *aff'd*, 650 F.3d 1300 (9th Cir. 2011) ...........................................................30

*In re Jacobs*,
   394 B.R. 646 (E.D.N.Y. 2008) ....................................................................55

*In re Lehman Bros. Holdings, Inc.*,
   433 B.R. 101 (Bankr. S.D.N.Y. 2010),
   *aff'd*, 455 B.R. 130 (S.D.N.Y. 2011)......................................................27, 31

*In re Manning*,
   831 F.2d 205 (10th Cir. 1987) .....................................................................41

*In re Motors Liquidation Co.*,
   563 B.R. 498 (Bankr. S.D.N.Y. 2016) .........................................................18

*In re Premier Operations*,
   294 B.R. 213 (S.D.N.Y. 2003) ......................................................................7

*In re Quebecor World (USA) Inc.*,
   719 F.3d 94 (2d Cir. 2013) ..........................................................................39

*In re Sentinel Mgmt. Group, Inc.*,
   728 F.3d 660 (7th Cir. 2013) .......................................................................33

*In re Tribune Fraudulent Conveyance Litig.*,
   818 F.3d 98 (2d Cir. 2016) ..........................................................................39

*In re UAL Corp.*,
   310 B.R. 373 (Bankr. N.D. Ill. 2004)...........................................................22

*In re World Trade Center Disaster Site Litig.*,
  754 F.3d 114 (2d Cir. 2014) ...................................................................18, 34

*Ins. Co. of N. Am. v. NGC Settlement Trust & Asbestos Claims Mgmt. Corp.*,
  118 F.3d 1056 (5th Cir. 1997) .......................................................................41

*Int'l Audiotext Network, Inc. v. AT&T*,
  62 F.3d 69 (2d Cir. 1995) ..............................................................18, 34, 38

*Intesa Sanpaolo. S.p.A. v. Credit Agricole Corporate & Inv. Bank*,
  2013 WL 4856199 (S.D.N.Y. Sept. 10, 2013) ..............................................38

*JPMorgan Chase Bank, N.A. v. Charter Commc'ns Op., LLC (In re Charter Commc'ns)*,
  419 B.R. 221 (Bankr. S.D.N.Y. 2009),
  *aff'd*, 691 F.3d 476 (2d Cir. 2012)................................................................52

*Lehman Bros. Special Fin. Inc. v. Ballyrock ABS CDO 2007-1 Ltd.*,
  2011 WL 9375423 (S.D.N.Y. Nov. 3, 2011) ............................................5, 53

*Lehman Bros. Special Fin. Inc. v. Ballyrock ABS CDO 2007-1 Ltd.*,
  452 B.R. 31 (Bankr. S.D.N.Y. 2011) ("*Ballyrock*")............................. *passim*

*Lehman Bros. Special Fin. Inc. v. BNY Corp. Trustee Servs. Ltd.*,
  422 B.R. 407 (Bankr. S.D.N.Y. 2010) ("*BNY*")....................................*passim*

*Level Export Corp. v. Wolz, Aiken & Co.*,
  305 N.Y. 82 (1953).......................................................................................38

*Lipsky v. Commonwealth United Corp.*,
  551 F.2d 887 (2d Cir. 1976) .........................................................................17

*Mercer v. Gupta*,
  712 F.3d 756 (2d Cir. 2013) .........................................................................18

*MHR Capital Partners LP v. Presstek, Inc.*,
  12 N.Y.3d 640, 912 N.E.2d 43 (2009) ..........................................................43

*Michigan State Housing Dev. Auth. v. Lehman Brothers Derivative Prods. Inc.*,
    502 B.R. 383 (Bankr. S.D.N.Y. 2013) ........................................15, 22, 24, 25

*Northrop Grumman Info. Tech., Inc. v. U.S.*,
    535 F.3d 1339 (Fed. Cir. 2008) ...................................................................39

*PAH Litig. Trust v. Water Street Healthcare Partners L.P. (In re Physiotherapy Holdings, Inc.)*,
    2016 WL 3611831 (Bankr. Del. June 20, 2016) ...........................................39

*PaineWebber Inc. v. Bybyk*,
    81 F.3d 1193 (2d Cir. 1996) .......................................................................38

*Picard v. Ida Fishman Revocable Trust (In re Bernard L. Madoff Inv. Sec. LLC)*,
    773 F.3d 411 (2d Cir. 2014) .......................................................................20

*Picard v. Katz,*
    462 B.R. 447 (S.D.N.Y. 2011) ...................................................................20

*Queens Boulevard Wine & Liquor Corp. v. Blum*,
    503 F.2d 202 (2d Cir. 1974) ..................................................................40, 50

*Rivera v. Smith*,
    375 F. App'x 117 (2d Cir. 2010) ................................................................17

*Riverdale Fabrics Corp. v. Tillinghast-Stiles Co.*,
    306 N.Y. 288 (1954) ...................................................................................38

*Roth v. Jennings*,
    489 F.3d 499 (2d Cir. 2007) .......................................................................17

*S.E.C. v. Rosenthal*,
    650 F.3d 156 (2d Cir. 2011) .......................................................................37

*Sardis v. Frankel*,
    113 A.D.3d 135, 978 N.Y.S.2d 135 (1st Dep't 2014)...................................55

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC)*,
    513 B.R. 437 (S.D.N.Y. 2014) ...................................................................20

*Sigmon v. Goldman Sachs Mortg. Co.*,
    539 B.R. 221 (S.D.N.Y. 2015) .......................................................52

*Swedbank AB (PUBL) v. Lehman Bros. Holdings Inc.*,
    445 B.R. 130 (S.D.N.Y. 2011) ....................................... 19, 22, 25, 26, 29, 40

*Torres v. Major Auto. Grp.*,
    2014 WL 4802985 (E.D.N.Y. Sept. 25, 2014) .............................................38

*Tyco Fire & Sec., LLC v. Alcocer*,
    218 F. App'x 860 (11th Cir. 2007) ................................................33

*U.S. v. Ron Pair Enters., Inc.*,
    489 U.S. 235 (1989) .......................................................17

*Yates v. U.S.*,
    135 S. Ct. 1074 (2015)........................................................21

## Statutes

11 U.S.C. § 101(38A) ..........................................................36

11 U.S.C. § 363 ........................................................1, 49, 50

11 U.S.C. § 365 .......................................... 16, 20, 40, 45, 48, 49, 50, 51, 53

11 U.S.C. § 502(c)(1)..........................................................22

11 U.S.C. § 541 ....................................................1, 40, 49, 50, 51

11 U.S.C. § 546(e) .........................................................39, 40

11 U.S.C. § 555..............................................................28

11 U.S.C. § 556 ..........................................................20, 27, 28

11 U.S.C. § 559..............................................................28

11 U.S.C. § 560 ....................................................................................*passim*

11 U.S.C. § 561 ...............................................................................28

11 U.S.C. § 726 ...............................................................................22

28 U.S.C. § 1334 ................................................................................1

28 U.S.C. § 1367 ................................................................................1

28 U.S.C. § 157 ...........................................................................1, 22

28 U.S.C. § 158 ................................................................................1

28 U.S.C. § 2201 ...............................................................................1

Fed. R. Bankr. P. Rule 8015 ..............................................................58

Fed. R. Civ. P. Rule 12(b)(6) .............................................................17

NY DCL § 273 ...................................................................................54

NY DCL § 274 ...................................................................................54

NY DCL § 278 ...................................................................................54

NY DCL § 279 ...................................................................................54

## **Other Authorities**

An Act to amend title 11, United States Code,
    Pub. L. No. 97-222, 96 Stat. 235 (1982) .......................................28

An Act to amend title 28 of the United States Code,
    Pub. L. No. 98-353, 98 Stat. 333 (1984) .......................................28

Bankruptcy: Swap Agreements & Forward Contracts,
    Pub. L. No. 101-311, 104 Stat. 267 (1990) ...................................................28

Black's Law Dictionary (10th ed. 2014) ...........................................................37, 38

GOOCH & KLEIN, DOCUMENTATION FOR DERIVATIVES (4th ed. 2002)....................29

H.R. Rep. No. 101-484 (1990),
    *reprinted in* 1990 U.S.C.C.A.N. 223 ............................................................27

H.R. Rep. No. 109-31 (2005),
    *reprinted in* 2005 U.S.C.C.A.N. 88 ..............................................................29

H.R. Rep. No. 95-595 (1977),
    *reprinted in* 1978 U.S.C.C.A.N. 5963 ..........................................................40

*Interest Swap: Hearing on S. 396 Before the Subcomm. on Courts and Admin.*
    *Practice of the S. Comm. on the Judiciary*, 101st Cong. 27 (1989)..............27

Rhett G. Campbell, *Energy Future and Forward Contracts, Safe Harbors*
    *and the Bankruptcy Code*, 78 Am. Bankr. L.J. 1 (2004)...............................28

S. Rep. No. 95-989 (1978),
    *reprinted in* 1978 U.S.C.C.A.N. 5787 ..........................................................40

Plaintiff-Appellant Lehman Brothers Special Financing Inc. ("LBSF"),
submits this brief in support of its appeal from the order of the United States
Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court")
dismissing Counts I through XIX of the Fourth Amended Complaint, (A150-243[1]),
(the "Complaint" or "FAC"), (A870-73), which was certified as final on January
24, 2017, (A874-79), (the "Order") and respectfully states as follows:

## JURISDICTIONAL STATEMENT

The Bankruptcy Court had subject matter jurisdiction because the action is a
core proceeding.  28 U.S.C. §§ 157, 1334, 1367, 2201.  On January 24, 2017, the
Bankruptcy Court entered the Order, which certified its prior order as final.  A874-
79.  LBSF timely filed its notice of appeal on February 6, 2017.  A880-81.

Because the Order is a final order, this Court has jurisdiction over LBSF's
appeal.  28 U.S.C. § 158.

## PRELIMINARY STATEMENT

The Bankruptcy Code contains three separate provisions prohibiting the
enforcement of contractual *ipso facto* clauses—clauses that change a party's rights
merely because of a bankruptcy.  *See* 11 U.S.C. §§ 363(l), 365(e)(1), 541(c)(1).
This prohibition is critical to the bankruptcy process as it protects creditors and

---

[1] Citations to the appendix submitted concurrently herewith are in the form "A*page
number*-*page number*."

insolvent businesses by preserving the bankruptcy estate.  Without it, contracts could be drafted to divert assets away from the estate whenever a party seeks bankruptcy protection.

This appeal involves *ipso facto* clauses that diverted billions of dollars from LBSF's estate by modifying its rights to payment on early termination of transactions under the Swap Agreements[2] described below.[3]  The underlying transactions are complicated but the *ipso facto* clauses' effect is straightforward: LBSF held valuable rights to payment upon Termination but—solely because LBSF's parent company, Lehman Brothers Holdings Inc. ("LBHI"), filed a bankruptcy petition—all the money was paid to other parties.  The *ipso facto* clauses were contained in dozens of indentures, which at the inception of the transactions established priority provisions that set the priority of payments to be made from the distribution of a limited pool of collateral on Termination (the "Priority Provisions").  While language in different agreements varies in minor respects, all the Priority Provisions share one critical feature: they modified LBSF's right to payment on Termination because of a bankruptcy, depriving LBSF of all of the money that it was owed under the Swaps.  In two earlier decisions in

_____

[2] Capitalized terms not defined herein are defined below or in the Transaction Documents (as defined in the Fourth Amended Complaint).

[3] The early termination of the Transactions is referred to herein as the "Termination."

2

the LBHI Chapter 11 case, Judge Peck held that virtually identical priority provisions involving LBSF were unenforceable *ipso facto* clauses and that Bankruptcy Code § 560 did not protect distribution of the collateral under the priority provisions.

The Bankruptcy Court below held the opposite, concluding that the *ipso facto* clauses can be enforced under § 560.  The Bankruptcy Court also held that most of the Priority Provisions are not *ipso facto* clauses at all, even though they diverted funds that LBSF would have received if not for the bankruptcy of LBHI. And the Bankruptcy Court ruled—again, expressly disagreeing with Judge Peck— that even if the provisions were *ipso facto* clauses, some could still be enforced if the Swap Agreements were terminated before LBSF filed its bankruptcy petition. These rulings by the Bankruptcy Court are incorrect as a matter of law.

The Bankruptcy Court erred in interpreting § 560 to protect the exercise of rights of the Trustees, who are not covered by its terms, and extending it to conduct not covered by the text.  Section 560 allows the exercise of limited contractual rights of a limited number of parties ("swap participant[s] or financial participant[s]") to cause "the liquidation, termination, or acceleration of . . . swap agreements."  11 U.S.C. § 560.  When the Transactions in this case were terminated and the Issuers liquidated them by calculating how much was owed to whom, the interests addressed by § 560 were fully served.  On Termination, LBSF

was due billions under the terms of the Swaps due to the contractual rights created by the parties' choice of Second Method to determine who was entitled to payment of Loss under the Swaps.[4]  Thereafter, the Trustees applied the Priority Provisions (which are not part of the Swaps) to modify LBSF's right to payment ahead of the Noteholders.  Even if changing LBSF's priority could be considered part of "termination" or "liquidation," (which it is not), the safe harbor would still be inapplicable because no swap participant or financial participant held the contractual right to cause such modifications to occur: the Issuers, who were the only swap participants, had no contractual rights to take any action with respect to the Collateral or the distribution of its proceeds.  Section 560 is designed to minimize volatility, which was achieved by allowing the Issuers to terminate the Swap Agreements and calculate (or liquidate) amounts due thereunder.  The Noteholders who received billions of dollars in windfall payments were not swap participants, and so allowing them a windfall at LBSF's expense did not further the goal of § 560.

The Bankruptcy Court's other grounds for enforcing the Priority Provisions also fail.  All the Priority Provisions are *ipso facto* clauses, not just some of them (as the Bankruptcy Court held).  The touchstone of an *ipso facto* clause is that it

---

[4] *See* A585-88 (showing that while LBSF is owed $36,713,000, it will receive nothing due to the Priority Provisions); *see also* A592-96; A599-601; A603-06, A607-11; A614.

4

changes the rights between contracting parties because of a bankruptcy filing. All the Priority Provisions did that. The FAC alleges that LBSF was owed billions of dollars on Termination. When the Indentures' Priority Provisions were applied, LBSF lost all that money for one reason alone—LBHI's bankruptcy filing. Insignificant differences in language among the Priority Provisions do not alter that fact. The Priority Provisions are therefore textbook *ipso facto* clauses.

Those clauses are unenforceable regardless of whether Termination occurred before or after LBSF's bankruptcy. As Judge Peck previously determined, the application of the Priority Provisions, and not Termination (as the Bankruptcy Court held), modified LBSF's payment rights. Moreover, as Judge Peck twice held, the relevant bankruptcy after which *ipso facto* protections are available to LBSF was that of LBSF's parent, LBHI—which led directly to Termination and was the sole reason that LBSF's rights to payment were subordinated. The Bankruptcy Court's contrary ruling misreads the Bankruptcy Code's anti-*ipso facto* provisions and ignores a decision by Judge Crotty finding that this very issue is "a mixed question of law and fact," *Lehman Bros. Special Fin. Inc. v. Ballyrock ABS CDO 2007-1 Ltd.*, 2011 WL 9375423, at *4 (S.D.N.Y. Nov. 3, 2011), which cannot be decided on a motion to dismiss.

If left intact, the Bankruptcy Court's decision will not just deprive LBSF's creditors of billions of dollars that should have been paid to the estate under the

Swap Agreements.  It will also serve as an instruction manual to future parties who seek to evade the *ipso facto* prohibitions.  The creditors who suffer the brunt of the losses when the clauses are enforced never learn of them until it is too late because the creditors are not parties to the contracts.  The Bankruptcy Court's holding that most of the Priority Provisions are not *ipso facto* clauses because of minor non-substantive variations in the wording encourages sophisticated parties to use that wording or similar artificial distinctions to avoid the impact of *ipso facto* provisions.  The Opinion diverts billions of dollars from LBSF to the Noteholders solely because of LBHI's bankruptcy, and enables future parties to receive similar windfalls while creditors of future bankruptcy estates will bear the losses.

For the reasons set forth below, the Bankruptcy Court's Order should be reversed, and the case remanded for further proceedings.

## <u>STATEMENT OF ISSUES PRESENTED</u>

1.    Whether the Bankruptcy Court committed reversible error by construing § 560 to protect activities that did not constitute exercise of a contractual right of a swap participant to cause the "liquidation, termination, or acceleration" of a swap agreement.

<u>Standard of Review</u>:  De novo.  *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 334 (2d Cir. 2011).

2.      Whether the Bankruptcy Court committed reversible error when it

determined certain contractual clauses were not *ipso facto* clauses, including by

creating an artificial distinction between so-called Type 1 and Type 2 transactions

and determining that while Type 1 transactions contained *ipso facto* clauses, Type

2 transactions did not.

<u>Standard of Review</u>:  De novo.  *Goodheart Clothing Co., Inc. v. Laura Goodman*

*Enters., Inc.*, 962 F.2d 268, 272-73 (2d Cir. 1992).

3.      Whether the Bankruptcy Court improperly dismissed Counts XIII-XVI

based on the erroneous conclusion that there was no *ipso facto* violation.

<u>Standard of Review</u>:  De novo.  *In re Premier Operations*, 294 B.R. 213, 217

(S.D.N.Y. 2003).

4.      Whether the Bankruptcy Court committed reversible error by dismissing the

claim that certain contractual provisions constituted unenforceable penalty clauses.

<u>Standard of Review</u>: De Novo.  *Id.*

## **<u>STATEMENT OF THE CASE</u>**

## I.      **FACTUAL BACKGROUND**

### A.      LBSF and the Issuers Enter into Swap Agreements that
<u>Protect LBSF from Risk in the Mortgage and Bond Markets</u>

Each collateralized debt obligation ("<u>CDO</u>") at issue is similarly structured.

Special purpose entities (the "<u>Issuers</u>") entered into credit default swap agreements

(the "Swap Agreements" or "Swaps"[5]) with LBSF, under which LBSF bought credit protection from the Issuers on a group of referenced securities.  A158, ¶ 2. The Swaps consist of an ISDA Master Agreement (a pre-printed form), Schedules with terms tailored to the particular deal, and Confirmations setting forth the terms of each Transaction.  *See* A819.  Neither the Trustees nor the Noteholders were parties to the Swaps.  *See* A172, ¶ 55.  LBHI guaranteed LBSF's obligations to the Issuers under the Swaps.

A default by LBSF (including a bankruptcy filing by LBSF or LBHI) allowed the Issuer, as Non-Defaulting Party, to terminate all Transactions under the Swaps by written notice to LBSF.  Upon Termination, the Non-Defaulting Party was to calculate an early termination payment amount generally equal to the Non-Defaulting Party's Loss.  *See* A446-47, § 6(e); A458, Part 1(c)(i).  Each Swap provided that whichever party was "in-the-money" when the Swap was terminated would be entitled to a payment, even if it was the Defaulting Party.  *See* A446-47, § 6(e).  This convention is known as "Second Method," (*see* A458, Part 1(c)(i); A819-20) and is critical to understanding the nature of the property interest that was forfeited by LBSF by virtue of the implementation of prohibited *ipso facto* provisions in the Indentures.  Under another convention, not applicable here ("First

---

[5] The various transactions occurring under the Swaps are defined as the "Transactions."

Method"), the Defaulting Party would not be entitled to any payment.  LBSF was the Defaulting Party and it was heavily in-the-money on each Swap at issue here, as the value of the referenced securities had deeply declined.  A160, ¶ 7; A180-81, ¶ 81.  Absent the application of the Priority Provisions, LBSF would have been entitled to be paid billions of dollars on Termination.  A585-88; A592-96; A599-601; A603-06, A607-11; A614; A180-81, ¶ 81.

The Bankruptcy Court misunderstood the importance of Second Method when it held that this "calculation method simply establishes the amount of an obligation; it does not create **or affect in any way** a right to payment of that obligation."  A837, n.81 (emphasis added).  In fact, the contractually mandated use of Second Method creates and directly affects LBSF's right to payment, and indicates the parties' intent to allow a party to the Swaps to be paid even if it filed for bankruptcy or was otherwise the Defaulting Party.  The extension of the safe harbor to the Priority Provisions thus frustrated the application of Second Method chosen by the parties.

B.     The Trustees and the Issuers Enter into Indentures

In each CDO, the Issuer issued notes or trust certificates (collectively, the "Notes") under an indenture (or a trust agreement) (collectively, the "Indentures") specifying a trustee (the "Trustee").[6]  A171-72, ¶ 52.  Under the documents, the

---

[6] New York law governed all but two Indentures.

proceeds from the sale of the Notes by the Issuer to investors (the "Noteholders") were used to acquire securities (the "Collateral") (*id.* ¶¶ 52-53) that were pledged to the Trustees for the benefit of the Secured Parties.  Significantly, LBSF and the Noteholders were the only Secured Parties (not the Issuers, contrary to the Bankruptcy Court's finding).  A858; A172-73, ¶ 57.  The Collateral did not secure the Issuers' rights to any payment that might have been due from LBSF under the Swaps.

Only the Issuers and the Trustees were parties to the Indentures.  LBSF was a third-party beneficiary entitled to enforce the Indentures.  Although the Indentures gave the Trustees the power to enforce the Issuers' rights under the Swaps on default, the Issuers had no rights to apply the Priority Provisions or distribute the Collateral under the terms of either the Swaps or the Indentures.

The Priority Provisions in the Indentures, directing how money is to be distributed after Termination, are generally contained in Series Indenture § 5(a)(iii).[7]  A753-54.  Although the precise wording of the various Indentures differed slightly, the effect of each provision was the same: upon Termination the Collateral was to be distributed to pay LBSF amounts it was due *before* any payment to the Noteholders, *unless LBSF was the Defaulting Party.*  If LBSF or

---

[7] Any differences among the Transaction Documents have no material economic difference.

LBHI filed for bankruptcy and LBSF was therefore the Defaulting Party, the Priority Provisions changed where LBSF stood in line to be paid, dropping LBSF's right to payment below the Noteholders, notwithstanding LBSF's in-the-money position on the Swaps. *See* A180-81, ¶ 81. In each CDO, that modification resulted solely from the default caused by a bankruptcy filing. A822.

Termination was an Event of Default under the Indentures, causing acceleration of the Notes. *See* A662, § 5.1(f). Upon an Event of Default, the Indentures permitted, *but did not require*, the Trustee (and only the Trustee) to dispose of the Collateral. A667-68, § 5.4; *see also* A175-76, ¶ 69. Many Trustees refused to take action until they received indemnification from the Noteholders. *See* A772; A777. In fact, LBSF commenced separate adversary proceedings involving more than 100 CDOs (which are not the subject of this action) which had similar terms and the same trustees as in this case, in transactions in which the trustees chose not to apply the priority provisions and make payments to noteholders (the "Non-Distributed Deals").[8]

---

[8] *Lehman Bros. Special Fin. Inc. v. Wells Fargo Bank N.A.*, Adv. Proc. No. 10-03809 (Bankr. S.D.N.Y. Oct. 1, 2010); *Lehman Bros. Fin. Prods. v. U.S. Bank N.A.*, Adv. Proc. No. 10-03543 (Bankr. S.D.N.Y. Sept. 14, 2010); *Lehman Bros. Fin. Prods. v. Bank of N.Y. Mellon Trust Co. N.A.*, Adv. Proc. No. 10-03544 (Bankr. S.D.N.Y. Sept. 14, 2010); *Lehman Bros. Special Fin. Inc. v. Bank of N.Y. Mellon Corp.*, Adv. Proc. No. 10-03545 (Bankr. S.D.N.Y. Sept. 14, 2010); *Lehman Bros. Special Fin. Inc. v. Airlie LCDO I (Aviv LCDO 2006-3), Corp.*, Adv. Proc. No. 10-03542 (Bankr. S.D.N.Y. Sept. 14, 2010).

Termination alone did not allow immediate application of the Priority Provisions.  After Termination, five business days had to pass, the amount due had to be calculated, and the Trustees had to turn the Collateral into cash.  *See* A445, § 6(a); A663-64, § 5.2(a); A735, § 2; A753-54, § 5(a)(iii).  Only after those steps were taken could the Trustees pay Collateral proceeds to the Noteholders ahead of LBSF, which resulted in a staggering windfall to the Noteholders, whose Notes at the time were worth a fraction of their face amount.  A158-59, ¶ 3; A173-75, ¶¶ 61-64; A180-81, ¶¶ 81-82.

## II.   PROCEDURAL BACKGROUND

### A.   LBHI Files the Largest Ever Bankruptcy Case, Followed 18 Days Later by Its Wholly Owned Subsidiary LBSF

LBHI was formerly the nation's fourth largest investment bank.  A169, ¶ 38. For most of 2008, LBHI and its competitors operated in an extremely unfavorable global business environment, including lack of liquidity in the credit markets and declining values of financial assets.  *Id.* ¶ 39.  As the market crisis worsened, LBHI searched for an investor or acquirer.  *Id.*  During the weekend preceding September 15, 2008 (the "LBHI Petition Date"), LBHI negotiated with several potential acquirers of its businesses and conducted emergency meetings with the Treasury Secretary and the Federal Reserve, to attempt to resolve LBHI's liquidity crisis. *Id.* ¶ 40.  When it finally became apparent that a transaction that would enable LBHI to remain viable was not possible, LBHI had precious little time to prepare

and file a Chapter 11 petition before the markets opened the following Monday.

*Id.* Accordingly, although many of LBHI's subsidiaries, including LBSF, could

not operate without LBHI's credit support, LBHI and its advisors simply lacked

time to investigate and plan for Chapter 11 case filings of subsidiaries such as

LBSF at the time LBHI's Chapter 11 case commenced. A170, ¶ 44. Ultimately,

many of LBHI's domestic units filed their own Chapter 11 cases and on October 3,

2008 (the "<u>LBSF Petition Date</u>"), LBSF filed a voluntary petition for Chapter 11

relief. A171, ¶ 46.

      B.    Earlier Decisions by Judge Peck
            Held that the Priority Provisions Are Unenforceable
            <u>*Ipso Facto* Clauses and Are Not Protected by the § 560 Safe Harbors</u>

The Bankruptcy Court did not write on a blank slate in considering the

Motion.[9] In fact, Judge Peck issued three opinions in this Chapter 11 case

addressing the issues on this appeal. Judge Peck's opinions were consistent with

every case to rule on the scope of § 560 and, prior to the Bankruptcy Court's

Opinion, no court had rejected Judge Peck's earlier rulings.

---

[9] As used herein the term "<u>Motion</u>" refers to the Omnibus Motion of the
Noteholder Defendants to Dismiss the Fourth Amended Complaint, dated
December 14, 2015 [Dkt. No. 1195].

Judge Peck first considered the application of provisions similar to the Priority Provisions at issue here in *BNY*.[10]  Judge Peck held that, as a matter of law, the agreements that modified LBSF's rights to payment under the Swaps on an Event of Default caused by bankruptcy were unenforceable *ipso facto* clauses not protected by any safe harbor provision, including § 560.  Judge Peck substantially reaffirmed *BNY* in *Ballyrock*,[11] a case involving a deal structured similarly to the CDOs in this case and also governed by New York law (and largely overlooked in the Bankruptcy Court's analysis).  In *Ballyrock*, Judge Peck held that the Priority Provision, which substantially lowered LBSF's priority because of a default caused by LBHI's bankruptcy, deprived LBSF of valuable property rights, constituted a modification precluded by the Bankruptcy Code's anti-*ipso facto* provisions and was not protected by § 560.  In so concluding, Judge Peck interpreted § 560 to exclude ancillary activities beyond "liquidation, termination, or acceleration" of a swap agreement, stating that:

> Such a mandated elimination of a substantive right to receive funds that existed prior to the bankruptcy of LBHI should not be entitled to any protection under safe harbor provisions that, by their express terms, are limited exclusively to preserving the right to liquidate, terminate

---

[10] *Lehman Bros. Special Fin. Inc. v. BNY Corp. Trustee Servs. Ltd.*, 422 B.R. 407 (Bankr. S.D.N.Y. 2010) ("*BNY*").

[11] *Lehman Bros. Special Fin. Inc. v. Ballyrock ABS CDO 2007-1 Ltd.*, 452 B.R. 31 (Bankr. S.D.N.Y. 2011) ("*Ballyrock*").

and   accelerate   a   qualifying   financial   contract.

*Ballyrock*, 452 B.R. at 40.  And, in *MSHDA*,[12] while deciding that § 560 protected

a swap counterparty's right to calculate the amount due under a terminated swap,

Judge Peck specifically distinguished and reaffirmed his *BNY* and *Ballyrock*

holdings.

C.     The Bankruptcy Court Decision

On October 13, 2015, LBSF filed the FAC.  On December 14, 2015, the

Movants[13] filed the Motion.  On June 28, 2016, after the Motion was fully briefed

and argued, the Bankruptcy Court granted the Motion and dismissed Counts I-XIX

of the FAC in its Memorandum Decision, (A809-67) (the "Opinion").  The

Opinion refused to follow *BNY* and *Ballyrock* on several important points,

including the applicability of § 560, the deprivation of LBSF's property interests

and the timing of the modification of LBSF's rights under the Swaps.  A836-58.

## SUMMARY OF ARGUMENT

The Bankruptcy Court reached conclusions that are manifestly at odds with

the language of the Bankruptcy Code and the parties' agreements.  Section 560

only protects the exercise of contractual rights of swap participants or financial

---

[12] *Michigan State Housing Dev. Auth. v. Lehman Brothers Derivative Prods. Inc.*, 502 B.R. 383 (Bankr. S.D.N.Y. 2013) ("*MSHDA*").

[13] As used herein the term "Movants" refers to the parties who joined the Motion.

participants, which in this case included only LBSF and the Issuers.  The Issuers

held no contractual rights to distribute the Collateral or its proceeds under the

Priority Provisions.  Nor can the Issuers' right to cause termination or liquidation

of the Swaps be stretched to encompass the Trustees' distribution of Collateral

under the Indentures to the Noteholders, who were not even parties to the Swaps.

There is no legal or factual difference between the so-called "Type 1" and

"Type 2" transactions invented by the Bankruptcy Court, (A832-35), and if

modifications prohibited by § 365 occurred in Type 1 deals (as the Bankruptcy

Court held) (*see* A836-38), then the same must be true in Type 2 deals.  The

Bankruptcy Court's findings as to when modifications occurred are unsustainable.

A868-47.  The Bankruptcy Court erred in rejecting Judge Peck's decisions in *BNY*

and *Ballyrock*, (*see* A841-43), which provide the better reasoned approach to the

issues in this case.  Reinstatement of the *ipso facto* claims should result in revival

of the state law claims as well.

## ARGUMENT

## I.    STANDARD OF REVIEW

An appellate court reviews *de novo* a grant of a motion to dismiss, including

the Bankruptcy Court's legal and statutory interpretation and its interpretation of

contractual terms.  *See Deutsche Bank Nat'l Trust Co. v. Quicken Loans Inc.*, 810

F.3d 861, 865 (2d Cir. 2015).  "[T]he Court's role [on a motion to dismiss] is not to

resolve ambiguities in the language of the contract," *DKR Capital, Inc. v. AIG Int'l W. Broadway Fund, Ltd.*, 2003 WL 22283836, at *4 (S.D.N.Y. Oct. 2, 2003) (citing *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 897 (2d Cir. 1976)); that is for the finder of fact after the receipt of evidence. *Id*. An appellate court "reviews *de novo* questions as to the plain meaning or ambiguity of the language of a contract." *Fabozzi v. Lexington Ins. Co*., 601 F.3d 88, 90 (2d Cir. 2010). Statutory language must be applied consistent with its plain meaning. *See U.S. v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989).

Courts review a dismissal order "construing the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Rivera v. Smith*, 375 F. App'x 117, 118 (2d Cir. 2010) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)). A court may not dismiss a complaint that states a plausible version of events "merely because the court finds a different version more plausible." *Anderson News LLC v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012). "[A] ruling on a motion for dismissal pursuant to Rule 12(b)(6) is not an occasion for the court to make findings of fact." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007). Contractual rights not apparent from the face of the relevant agreement may not defeat a plaintiff's claim on a motion to dismiss, since a court may only imply a term in a contract if it finds the agreement to be ambiguous, (*see In re*

17

*World Trade Center Disaster Site Litig.*, 754 F.3d 114, 122 (2d Cir. 2014)), and contractual ambiguities must be resolved in plaintiff's favor on a motion to dismiss.  *See Int'l Audiotext Network, Inc. v. AT&T*, 62 F.3d 69, 72 (2d Cir. 1995); *DKR Capital, Inc.*, 2003 WL 22283836, at *1.

Generally an affirmative defense, like § 560, may not provide a basis for dismissal if to do so requires consideration of facts outside the complaint.  *Mercer v. Gupta*, 712 F.3d 756, 759 (2d Cir. 2013); *In re Motors Liquidation Co.*, 563 B.R. 498, 505 (Bankr. S.D.N.Y. 2016).

## II.    THE § 560 SAFE HARBOR IS NOT APPLICABLE

Bankruptcy Code § 560 provides, in relevant part, that:

> The exercise of any contractual right of any swap participant or financial participant to cause the liquidation, termination, or acceleration of one or more swap agreements because of a condition of the kind specified in section 365(e)(1) of this title . . . shall not be stayed, avoided, or otherwise limited . . . in any proceeding under this title.

11 U.S.C. § 560.

This provision does not protect the challenged actions because (i) the only parties protected by § 560 are the Issuers, (ii) the protected contractual rights are limited to the Issuers' right to cause liquidation, termination, or acceleration of the Swaps alone, (iii) the Issuers had no contractual rights to distribute or make payment of the Collateral, and the Trustees were not exercising rights of the

Issuers when the Trustees did so, and (iv) liquidation does not include payment, but even if it did, the funds that were distributed were not obtained from liquidation of the Swaps, but rather from enforcement of the Indentures by the Trustees, whose actions are not covered by § 560.

As Judge Peck recognized in *BNY* and *Ballyrock*, § 560 is limited in scope and protects only the ability of *certain* counterparties, to exercise *certain* rights, with respect to *certain* contracts.  *See BNY*, 422 B.R. at 421; *Ballyrock*, 452 B.R. at 39-40.  This Court's decision in *Swedbank AB (PUBL) v. Lehman Bros. Holdings Inc.*, 445 B.R. 130 (S.D.N.Y. 2011), further confirms that the reach of § 560 is more limited than that adopted by the Bankruptcy Court below.  In *Swedbank*, this Court interpreted § 560 to allow Swedbank "to terminate the Master Agreements and to determine a single net termination value," but rejected the extension of § 560 to reach the "general commercial obligations of parties to swap agreements," such as the obligations contained in the Indentures here.  *Id.* at 135, 137.

Section 560 is not blanket protection and it "does not provide a swap participant" with "unqualified right[s]."  *In re Enron Corp.*, 306 B.R. 465, 473 (Bankr. S.D.N.Y. 2004) (holding that § 560 permits the termination of a swap agreement only under circumstances specified under the statute).  Indeed, § 560 applies only to those factual circumstances that comport specifically with its statutory language and purpose.  *In re Amcor Funding Corp.*, 117 B.R. 549, 551

(D. Ariz. 1990) (interpreting the Safe Harbor Provisions as permitting liquidation

"if it is *in fact* doing so for one of the three reasons set forth in § 365(e)(1) [as

stated by the statute]" (emphasis added)); *see also Calpine Energy Servs., L.P. v.*

*Reliant Energy Elec. Solutions, L.L.C. (In re Calpine Corp.)*, 2009 WL 1578282, at

*7 (Bankr. S.D.N.Y. May 7, 2009) (allowing protection under a similar safe harbor

only for termination, not rights that are ancillary or incidental to termination in the

context of § 556).  The Opinion's construction of § 560 is incompatible with the

language of the statute, the transaction documents and legislative history.[14]

A.      The Bankruptcy Court Improperly Extended § 560
        to Cover "Ancillary" Acts Beyond the "Liquidation,
        Termination, or Acceleration" of a Swap Agreement

The Bankruptcy Court erred in effectively collapsing Termination of the

Transactions and distribution of the proceeds of the Collateral under a separate

Indenture, which encompassed multiple steps and necessarily occurred days later,

---

[14] Additionally, in its § 560 ruling, the Bankruptcy Court went outside the pleadings and determined facts with respect to the parties whose conduct was encompassed by § 560 and the scope of the contractual rights protected.  The Bankruptcy Court cited the *Madoff* cases as support for its authority to adjudicate an affirmative defense on a motion to dismiss.  A848-49 (citing *Picard v. Katz,* 462 B.R. 447, 452 (S.D.N.Y. 2011), *abrogated on unrelated grounds by Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC)*, 513 B.R. 437 (S.D.N.Y. 2014); *Picard v. Ida Fishman Revocable Trust (In re Bernard L. Madoff Inv. Sec. LLC)*, 773 F.3d 411, 415 (2d Cir. 2014)).  In the *Madoff* cases, however, plaintiff had pled in its complaints the basis for application of the safe harbors at issue there.  This case is different since the facts alleged in the Complaint do not provide a basis to dismiss under the safe harbor. Accordingly it was error to dismiss Plaintiff's claims based on § 560.

into a single event protected by § 560.  A850-56.  The only rights the Issuer has that are protected by the safe harbor are the rights to cause Termination and the right to calculate (i.e., liquidate) amounts owed under the Swap.  The Trustees' subsequent payment to the Noteholders of amounts due on the Notes under an Indenture is not a contractual right of the Issuer and was far beyond, and at most ancillary, to any "liquidation, termination, or acceleration" of the Swap.  In reaching the opposite conclusion, the Bankruptcy Court not only ignored the terms of the governing agreements, it also broke with every court that has discussed the reach of § 560.

1. *The Bankruptcy Court Improperly Construed the Word "Liquidation" as Used in § 560*

The Bankruptcy Court held that "liquidation" as used in § 560 means the same thing as "payment," (A851),[15] even though the Bankruptcy Code does not define "liquidation" and § 560 makes no mention of payment.  In so ruling, the Bankruptcy Court overlooked the settled principle of statutory construction that identical words used in different parts of the same statute presumptively have the same meaning.  *IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005).  While the

---

[15] The Bankruptcy Court relied on a secondary dictionary definition of "liquidation" in deciding § 560 protected the Trustee's challenged actions (A851, n.123).  But courts interpreting statute must look beyond "dictionary definitions" to "the specific context in which [the] language is used, and the broader context of the statute as a whole." *Yates v. U.S.*, 135 S. Ct. 1074, 1081-82 (2015).

Bankruptcy Code does not define "liquidation," Congress used that term, or derivations of it, elsewhere in the Code, or in closely related jurisdictional legislation, in ways inconsistent with the Bankruptcy Court's finding that such term encompasses the act of "payment."

For example, in Chapter 7, the "liquidation" chapter of the Bankruptcy Code, Congress used the term "distribution," and not "liquidation," to describe the payment of proceeds of a Chapter 7 estate to creditors.  11 U.S.C. § 726.  Section 502(c)(1) speaks to "liquidation" of a contingent or unliquidated claim, which means fixing the amount of the claim without regard to whether or when that liquidated claim is paid.  *In re Dow Corning Corp.*, 215 B.R. 346, 355-57 (Bankr. E.D. Mich. 1997).  As the *Dow Corning* court noted, no other Bankruptcy Code sections, nor the jurisdictional provisions of 28 U.S.C. § 157(b)(2)(B), which use the term liquidation or a variant thereof, do so in a context which either states or implies that "liquidation" means "payment."  *See id.* at 359-60.  Rather, in the Bankruptcy Code "liquidation" means either sale or "determination of the amount of."  *See In re UAL Corp.*, 310 B.R. 373, 379-80 (Bankr. N.D. Ill. 2004); *MSHDA*, 502 B.R. at 386; *Swedbank AB (PUBL)*, 445 B.R. at 136 n.4.  Had the Bankruptcy Court construed the word "liquidation" in a manner consistent with its use in other sections of the Code, it would have concluded, as did Judge Peck, that the term did not encompass the Trustees' distribution of the Collateral.

The language of the Indentures also does not support treating "liquidation" as encompassing "payment."  In fact, the Indentures recognize a marked difference between liquidation of Collateral and payment of the proceeds of that liquidation; the act of payment is not characterized as "liquidation" in the Indentures.  Instead, the Standard Terms use the word "Distribution" to mean "any payment of principal or interest," and the date on which payment is to occur is defined as the "Distribution Date," not the "liquidation date."  *See* A624, § 1.1; A735, § 2.  The Indentures do not define "liquidation," or use that term in a manner that suggests the parties intended it to include Distribution.  The Standard Terms use the term "liquidation" and its derivations numerous times, but never in a manner that suggests that it means "payment."  *See* A663, § 5.1(c); A666, § 5.3(d)(ii); A668, § 5.4(d); A678, § 6.8(d)(ii); A681, § 6.12(b); A689, § 7.10(a)(xi); A695-96, § 7.13; A700, § 8.2(f).

On a number of occasions the Freedom Park Series Indenture (representative of the other Indentures) distinguishes between liquidation and payment.  Standard Terms § 6.14 uses the words liquidation and distribution (i.e., payment) separately in the same sentence to describe clearly different actions.[16]  Indenture §§ 6(c), 9(a)

---

[16] Section 6.14 provides, in relevant part, that after payment in full of the Notes, the Trustee shall perform certain actions "until the following occurs: the liquidation of the remaining Collateral and the final distribution of the proceeds of that liquidation."  A682.

and 9(c) identify the account in which to deposit the proceeds of liquidation of the Posted Collateral, which would not have been needed if liquidation meant the same thing as payment, but say nothing about payment of such proceeds.  A755; A760-61.

The Bankruptcy Court's reliance (A853-54) on Judge Peck's subsequent *MSHDA* decision to support its holding that liquidation means payment is misplaced.  In *MSHDA*, Judge Peck specifically reaffirmed that § 560 does not protect a trustee's application of priority provisions such as those here; therefore, *MSHDA* does not support equating "liquidation" with "payment."  502 B.R. at 395.  What the Bankruptcy Court apparently misapprehended is that *MSHDA* involved only two counterparties and a swap agreement provision that allowed for alternative methods to calculate the amounts due from one party to the other.  *Id.* at 387-89.  One method resulted in a much larger payment to the non-defaulting counterparty.  *Id.* at 389.  Conceding that employment of the alternative methodology would cause a diminution in value to LBSF, Judge Peck nonetheless found that the clause in the swap agreement fell within the safe harbor of § 560 because its implementation was part of the liquidation of (i.e., calculation of the amount due under) the Swap.  The safe harbor action in *MSHDA* had nothing to do with who was to receive payment.  *Id.* at 394.  The right to "liquidate, terminate or accelerate" the swap undeniably belonged to Michigan Housing, a swap

24

participant, and no amounts due under the swap could be calculated without choosing a methodology.  It was precisely because of these distinctions that Judge Peck, in *MSHDA*, forcefully reaffirmed his *BNY* and *Ballyrock* holdings.  *Id.* at 395.

### 2.   The Bankruptcy Court's Decision is Inconsistent with Prior Case Law and Congressional Intent

As Judge Peck correctly held, § 560 of the Bankruptcy Code "deal[s] expressly with the liquidation, termination or acceleration (*not the alteration* of rights as they then exist)" and, therefore, "the Noteholder Priority provision . . . do[es] not fall under the protections set forth therein."  *BNY*, 422 B.R. at 421 (emphasis added).  The language of § 560 specifically protects only "the exercise of any contractual right of any swap participant or financial participant to cause *the liquidation, termination, or acceleration* of one or more swap agreements . . . *or to offset or net out any termination values or payment amounts arising under or in connection with the termination, liquidation, or acceleration* of one or more swap agreements."  11 U.S.C. § 560 (emphasis added).  The exercise of other ancillary rights, such as altering a counterparty's right to receive payment, is *not* protected.

The interpretation of § 560 in *BNY* and *Ballyrock* is consistent with this Court's ruling in *Swedbank*.  In *Swedbank*, this Court affirmed Judge Peck's ruling that the scope of § 560 is limited and covers the right to "terminate the Master Agreements and to determine a single net termination value"—a scope inconsistent

with the expansive reach that the Bankruptcy Court gave to § 560.  *See Swedbank AB (PUBL)*, 445 B.R. at 137.

Judge Peck's rulings in *BNY* and *Ballyrock* and this Court's ruling in *Swedbank* are supported by the legislative history of § 560.  In enacting § 560, Congress sought to protect markets from the volatility associated with delaying the resolution of swap agreements.  *Enron*, 306 B.R. at 472.  Enforcement of provisions that modify a debtor's right to payment based upon a bankruptcy filing is not necessary to minimize volatility, since that objective is satisfied by allowing termination and the calculation (or "liquidation") of the net amount due on a swap. The Priority Provisions are not termination or netting provisions.  Instead, as Judge Peck recognized in *BNY*, these provisions "dictate the *means*" for distribution of proceeds of collateral pledged by the swap participant to two of its secured creditors without changing the total amount actually payable.  422 B.R. at 421. They were written with a separate nature, purpose and intent than the termination or netting provisions in the swap agreement, and therefore are not entitled to the protections accorded the exercise of termination and netting rights for swap participants under § 560.  *In re Am. Home Mortg., Inc.*, 379 B.R. 503, 521, 523 (Bankr. D. Del. 2008) (finding servicing provision in repurchase agreement was different in nature and purpose and was separate from the repurchase agreement and thus, was not entitled to the safe harbor benefits afforded repurchase

26

agreements); *In re Calpine Corp.*, 2009 WL 1578282, at \*7 (rejecting argument that a contractual provision that "goes to the very heart of the termination process" requiring debtor to notify counterparty of a dispute to settlement amount was safe harbored under § 556, the forward contract analogue to § 560); *see also BNY,* 422 B.R. at 421; *Ballyrock*, 452 B.R. at 39-40.

Congress enacted the safe harbors to allay concerns that "the *termination* and *setoff* of a swap agreement would be automatically stayed when one of the parties files a bankruptcy petition," and that a trustee, "after indefinitely postponing termination of the swap agreement, could refuse setoff and unfairly 'cherry pick' only the portions of the agreement advantageous to the debtor." *In re Lehman Bros. Holdings, Inc.*, 433 B.R. 101, 110-11 (Bankr. S.D.N.Y. 2010) (emphasis added), *aff'd*, 455 B.R. 130 (S.D.N.Y. 2011) (internal citation omitted). The legislative history for § 560 contains no mention of any right to "modify" the debtor's right to payment. *See* H.R. Rep. No. 101-484, at 2-4 (1990), *reprinted in* 1990 U.S.C.C.A.N. 223, 224-26; *see also Interest Swap: Hearing on S. 396 Before the Subcomm. on Courts and Admin. Practice of the S. Comm. on the Judiciary*, 101st Cong. 27 (1989) (statement of Mark C. Brickell, Chairman, ISDA); *id.* at 51-55 (statement of Perlstein).

The addition of the word "liquidation" to § 560 in 2005 was simply intended to clarify that it covered all methods of closing out a swap; no legislative

history indicates that Congress intended to broaden the scope of § 560 by adding

the word "liquidation" to the safe harbor, as the Bankruptcy Court below

improperly held.  Congress included the word "liquidation" in § 560 in 2005 to

harmonize the language of § 560 with other similar safe harbors like §§ 555, 556,

559 and 561.  Prior to 2005, § 560 did not contain the word "liquidation," and

referred only to the "termination" of swap transactions.  Bankruptcy: Swap

Agreements & Forward Contracts, Pub. L. No. 101-311, 104 Stat. 267 (1990).

Section 555 (securities contracts), § 556 (forward contracts), and § 559 (repurchase

agreements), on the other hand, only protected counterparties' right to "liquidate."

*Id*.[17]  Although it was understood in the industry that both "liquidation" and

"termination" were means of "closing out" transactions, there was uncertainty

about whether a court might prevent a party liquidating contracts under § 556 from

also "terminating" its contracts.  Rhett G. Campbell, *Energy Future and Forward*

*Contracts, Safe Harbors and the Bankruptcy Code*, 78 Am. Bankr. L.J. 1, 22

(2004).  Each of §§ 555, 556, 559, and 560 was, therefore, amended in 2005 to

protect rights to "liquidate, terminate, or accelerate" as part of Congress's efforts to

make its protection of close-out rights consistent regardless of industry-specific

---

[17] *See also* An Act to amend title 11, United States Code, Pub. L. No. 97-222, 96
Stat. 235 (1982); An Act to amend title 28 of the United States Code, Pub. L. No.
98-353, 98 Stat. 333 (1984).

terminology.  *See, e.g.*, H.R. Rep. No. 109-31, pt. 1, at 132-33 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 192-93.

However, "closing out" does not include making payment.  A leading treatise on derivatives confirms that the proposed 2005 amendments were limited to facilitating closing out transactions and therefore do not reach making payment.  *See* GOOCH & KLEIN, DOCUMENTATION FOR DERIVATIVES 305-06 (4th ed. 2002).  Indeed, the 2005 legislative history makes no mention of broadening the scope of the safe harbor to encompass "payment" and one would expect that such a major change would have been accompanied by some legislative history explaining such an expansion.  *Cf. Swedbank*, 445 B.R. at 137 ("[H]ad Congress intended to alter the bedrock principles of mutuality and priority, there would be some mention of this in the legislative history rather than the total silence that presently confronts us").  Contrary to the Bankruptcy Court's conclusion (A854), the inclusion of the term "liquidation" in § 560 was designed to be another synonym for closing out or terminating a swap, not to broaden the reach of § 560.[18]  There is no support in the

---

[18] Indeed, Congress noted that the 2005 amendments adding the term "liquidation" to 560 were intended to reduce systemic risk by allowing "the expeditious *termination or netting* of certain types of financial transactions."  H.R. Rep. No. 109-31, pt. 1, at 20 (emphasis added). "Liquidation" does not equate to a swap participant's enforcement (let alone the enforcement by a non-swap participant such as a Noteholder) of a right to *payment*.

statutory language, the reasons for its enactment, or the Transaction Documents for

the Bankruptcy Court's construction of the term "liquidation" in § 560.

> **B.**    **The Bankruptcy Court Improperly Extended**
> **§ 560 to Apply to Exercise of Rights of Parties**
> **That Are Not Swap Participants or Financial Participants**

Section 560 expressly protects the rights of "*swap participant*[s] . . . to cause

the liquidation, termination, or acceleration of . . . *swap agreements*."  11 U.S.C. §

560 (emphasis added).  The only "swap participants" in this case are the Issuers,

because they are the only parties to the Swap Agreements with the debtor.[19]  But

the Issuers have no contractual rights after default to take the steps that the

Bankruptcy Court held to be protected by § 560: enforcing the Priority Provisions

and distributing the Collateral under the Swaps or the Indentures.[20]  Only the

---

[19] The Bankruptcy Court acknowledged for purposes of the Motion that the Issuers were swap participants and did not make any finding as to whether the Trustees qualified as a swap participant or financial participant.  *See* A856-57.  This record does not support a finding, and the Bankruptcy Court made no such finding, that the Trustees are financial participants or swap participants.

[20] In concluding that the Issuers' obligation to pay the Notes gave rise to a right to distribute the Collateral, (A858), the Bankruptcy Court erroneously conflated a right and an obligation.  The Issuers' payment obligations are not part of the Issuers' rights, and on its face, § 560 does not protect discharge of "obligations," it only protects exercise of contractual rights.  A right is a "legally enforceable claim of one person against another, that the other shall do a given act, or shall not do a given act." *Dennis v. Higgins*, 498 U.S. 439, 447 n.7 (1991).  An obligation, by contrast, is a legal duty, *Cruz v. Leviev Fulton Club, LLC*, 711 F. Supp. 2d 329, 336 (S.D.N.Y. 2010), such as the Issuers' legal duty to pay the Notes.  *See Chicago, R.I. & P. Ry. Co. v. Sturm*, 174 U.S. 710, 714 (1899); *In re Herrera*, 422 B.R. 698, 717 (B.A.P. 9th Cir. 2010), *aff'd*, 650 F.3d 1300 (9th Cir. 2011) (a duty

*Trustees* held the right to distribute the Collateral.  And because the Trustees are not swap or financial participants, their distribution of the Collateral is not protected by § 560.

The Bankruptcy Court based its overbroad reading of § 560 on a misinterpretation of the contracts, which are the sole source of whatever Issuer rights are protected by § 560.  *See In re Lehman Bros. Holdings Inc.*, 433 B.R. at 108-09.  First, the termination, liquidation or acceleration of *the Swaps* did not cause any funds to be generated; no Collateral was posted *under the Swaps* (as opposed to the Indentures) and the Swaps were not sold or otherwise turned into money.  Even if liquidation is (incorrectly) construed to include the act of paying the proceeds of what was liquidated, there were no proceeds from liquidating the Swaps, which is what § 560 protects.  Hence, there is no basis to find that the funds were distributed due to the exercise of a contractual right to cause liquidation or termination of the Swaps themselves, as the plain language of § 560 requires.

The Court will search the Swaps and Indentures in vain for any right on the part of the Issuers to take any action with respect to the Collateral.  This is

imposed on a party to a contract is not a right).  Section 560 protects only the exercise of the Issuers' contractual rights under the Swap, not enforcement of the Issuers' obligations under the Indentures to pay Noteholders, who were not parties to the Swaps.  The Issuers had no right, much less any right under the Swaps, to enforce their own obligations under the Indentures to pay the Notes.

consistent with the structure of the deals, since the Issuers were indifferent as to who, as between LBSF and the Noteholders, received the proceeds of the Collateral.  The Issuers were special purpose vehicles with no business interests beyond the transactions in question.  All the Issuers' assets were pledged as Collateral (*see* A725-26, Series Indenture Granting Clause), and once the Collateral was exhausted the Issuers had no further liability for unpaid amounts. A467, Part 5(i); A712, § 12.16.  Accordingly, the Swaps do not give the Issuers the right to take any action with respect to the Collateral.  Neither the Movants nor the Bankruptcy Court identified any Swap provision creating such rights.

Nor did they identify any Indenture provision entitling the Issuers to pay the proceeds of the Collateral to the Noteholders.  Instead of identifying contract rights of the Issuers, the Bankruptcy Court treated the Trustees' enforcement actions as if the Trustees were exercising rights of the Issuers, (A856-57), but the documents do not expressly provide the Issuers with any such rights; whatever actions the Trustees took under the Indentures were perforce not the exercise of contractual rights of the Issuers.

Underpinning the Bankruptcy Court's determination that payment is encompassed by liquidation is its finding that distribution of the Collateral was "necessitated" by Termination.  A856.  Yet this finding is diametrically opposed to the Court's earlier determination that after Termination, the Trustees are "not

required" to liquidate the Collateral and distribute it. A818-19. Such internal inconsistency with respect to a key element of the Bankruptcy Court's rationale requires reversal. "[I]nternally inconsistent factual findings . . . are, by definition, clearly erroneous." *In re Sentinel Mgmt. Group, Inc*., 728 F.3d 660, 670 (7th Cir. 2013); *Tyco Fire & Sec., LLC v. Alcocer*, 218 F. App'x 860, 864 (11th Cir. 2007).

The fact that the trustees in the Non-Distributed Deals did not distribute the collateral after Termination in over 100 CDOs also undermines the Bankruptcy Court's conclusion that distribution was "necessitated" by Termination. Nothing in the Indentures supports the Bankruptcy Court's holding that the Issuers' right to Terminate mandated distribution of the Collateral or its proceeds.

In support of its mistaken conclusion that "liquidation and distribution of the Collateral and its proceeds . . . were rights that could be exercised by the Issuers," (A857), the Bankruptcy Court cited Standard Terms § 10.1(d). *Id.*, n.146. However, Standard Terms § 10.1(d) only requires that the Trustee and the Issuers enforce the terms of the Swaps as written after Termination; that section does not provide the Issuer with any rights under the Swaps which do not otherwise exist.[21] A705. While the Trustees are entitled to exercise the Issuers' rights, the point the

---

[21] Section 10.1(d) only requires the Issuer to enforce the Swaps "as may be permitted by the terms of such agreement and consistent with the terms hereof;" the Swaps did not give the Issuers any rights to affect the Collateral in any way. A705.

Bankruptcy Court missed was that the Issuers have no rights under the Swaps to affect the Collateral in any way.  Hence, § 10.1(d) is not a source of Issuers' rights protected by § 560.

As noted above, the Transaction Documents grant the Issuers—the only swap participant protected under § 560—no rights to cause payment of Collateral proceeds to the Noteholders.  Implying such a right in favor of the Issuers, as the Bankruptcy Court appears to do, (A856-58), is clear error.  A court may imply a contract term only if it finds the contract is ambiguous and the term may be fairly and reasonably fixed by the surrounding circumstances and the parties' intent, *In re World Trade Center Disaster Site Litig*. 754 F.3d at 122, but that process requires factual determinations prohibited on a motion to dismiss.  Moreover, courts must be "extremely reluctant" to imply a contract term that the parties themselves have not included.  *Id.* at 123.  The Bankruptcy Court did not make the required finding of contractual ambiguity; even if it had, it would have been error to resolve that contractual ambiguity against LBSF by implying the existence of rights in favor of the Issuers on a motion to dismiss.[22]  *See Int'l Audiotext Network, Inc.*, 62 F.3d at 72; *DKR Capital, Inc.*, 2003 WL 22283836, at *1.

---

[22] A court must decide, as a matter of law, whether significant contractual ambiguity exists and then the finder of fact must interpret the ambiguous contract after making of an evidentiary record.  *See Echelon Int'l Corp. v. Am. W. Airlines, Inc.*, 85 F. Supp. 2d 313, 317 (S.D.N.Y. 2000) (citing *Giles v. City of New York*, 41

C.    The Bankruptcy Court's Attempt to Distinguish
       Judge Peck's Analysis in *BNY* and *Ballyrock* is Flawed

Attempting to distinguish Judge Peck's refusal to equate "distribution" with

"liquidation" in *BNY*, the Bankruptcy Court maintained that "[t]he facts here are

different: here, it is clear that the Priority Provisions are either explicitly set forth

in the schedules to the ISDA Master Agreements or are incorporated into such

schedules from the Indentures."  A852.   Even a cursory review of the Schedules to

the Swaps makes clear that the Priority Provisions are not set forth in those

Schedules.  Nor was it proper to make a finding on the Motion that the Priority

Provisions are incorporated into the Schedules by reference.  Accordingly, the

attempted distinction of *BNY* and *Ballyrock* must fail.

In *BNY*, Judge Peck held that § 560 "refer[s] specifically to 'swap

agreements,'" and the priority provisions were not part of the Swaps; therefore, the

priority provisions do not fall under the protections of § 560.  *BNY*, 422 B.R. at

421.  While Judge Peck suggested that the failure to incorporate the indenture into

the swap was a factor in *BNY*, Judge Peck reaffirmed his *BNY* holdings in

*Ballyrock*, where the Swap contained substantially the same provision relied on by

---

F. Supp. 2d 308, 318 (S.D.N.Y. 1999)).  Instead of following those rules, the
Bankruptcy Court strained to find rights of the Issuers which do not exist in the
contracts.

the Bankruptcy Court here to find incorporation by reference.[23]  In *Ballyrock*,

Judge Peck found that the Priority Provisions, "once activated by the default of a

bankruptcy filing, would change the flow of funds in a manner that would deprive

LBSF of pre-existing distribution rights."  *Ballyrock*, 452 B.R. at 40.  Thus, Judge

Peck held the safe harbor did not extend to protect the payment of money to

noteholders through a waterfall in an indenture even where the indenture

provisions were indistinguishable from those here.

Judge Peck's *BNY* and *Ballyrock* decisions simply recognize that courts

strictly limit the safe harbor provisions to agreements, *or even portions of*

*agreements*, that by their nature and purpose meet the true criteria of the

underlying swap.  *See Am. Home Mortg.*, 379 B.R. at 521, 523; *see also* 11 U.S.C.

§ 101(38A) (expressly excluding from the definition of "master netting

agreement," and its corresponding protections, any "provisions [in a master netting

agreement] relating to agreements or transactions that are not" swap agreements,

commodity contracts, and repurchase agreements as those terms are defined under

the Bankruptcy Code).  The safe harbor does not permit contracting parties to

expand the reach of the safe harbors to non-swap documents through creative

---

[23] Ballyrock ABS CDO 2007-1 Ltd.'s Memorandum in Support of Its Motion to
Dismiss Lehman Bros. Special Fin. Inc.'s Complaint, *Lehman Bros. Special Fin.*
*Inc. v. Ballyrock ABS CDO 2007-1 Ltd.*, Adv. No. 09-1032, Dkt. No. 14 at 6-7
(Bankr. S.D.N.Y. Mar. 31, 2009).

drafting.  *See* H.R. Rep. No. 109-31, pt. 1, at 129 (2005), *reprinted in* 2005

U.S.C.C.A.N. 88, 190 (Congress did not intend "to permit parties to document

non-swaps as swap transactions").

The Bankruptcy Court held that a passing reference to the Priority

Provisions in Part 5(i) of the Swap Schedules incorporated them into the Swaps by

reference, by use of the term "subject to."[24]   A852.  The use of the ambiguous term

"subject to" in Schedule Part 5(i) does not, however, incorporate the Priority

Provisions into the Swaps by reference.  Part 5(i) is clearly intended only to define

the Issuers' liability; it protects the Issuer from unsatisfied claims of either LBSF

or the Noteholders that might survive complete disposition of the Collateral, after it

has been distributed under (i.e., "subject to") the Priority Provisions.  At most, the

term "subject to," is ambiguous[25] and cannot be properly construed against LBSF's

---

[24] Part 5(i) of the Schedule states in material part: "all amounts, payable or
expressed to be payable by [the Issuer] on, under or in respect of its obligations
and liabilities under this Agreement and any Confirmation hereunder shall be
recoverable only from and to the extent of sums in respect of, or calculated by
reference to, the Collateral that are received by Party B pursuant to the terms and
conditions thereof and the proceeds of any realisation of enforcement of any
Collateral, subject in any case to the Priority of Payments set out in the Indenture."
A467.

[25] The words "subject to" as used in Schedule Part 5(i) are susceptible to multiple
meanings, and are therefore ambiguous.  *S.E.C. v. Rosenthal*, 650 F.3d 156, 161
(2d Cir. 2011).  According to Black's Law Dictionary, the phrase "subject to" can
mean "under discretionary authority", "[d]ependent on or exposed to (some

interests on a motion to dismiss.  *Int'l Audiotext Network, Inc.*, 62 F.3d at 72; *DKR Capital, Inc.*, 2003 WL 22283836, at *1.

Even if the term "subject to" were held not to be ambiguous, it is not effective as a matter of law to incorporate the Priority Provisions into the Swaps.[26] Incorporation by reference requires the language to explicitly identify the referenced document and clearly communicate the incorporation by reference. *Torres v. Major Auto. Grp.*, 2014 WL 4802985, at *7 (E.D.N.Y. Sept. 25, 2014) ("it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms" (quoting *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir. 1996))); *Intesa Sanpaolo. S.p.A. v. Credit Agricole Corporate & Inv. Bank*, 2013 WL 4856199, at *3 (S.D.N.Y. Sept. 10, 2013) ("In addition to language explicitly identifying the referenced document, there must also be language that 'clearly communicate[s] that the purpose of the reference is to incorporate the referenced material into the contract[,] rather than merely to acknowledge that the referenced material is relevant to the contract, e.g., as

---

contingency)" or "liable" or "prone" to.  SUBJECT, Black's Law Dictionary (10th ed. 2014).

[26] *See Fenton v. Lipsius*, 1969 WL 10910, at *1 (N.Y. Sup. Ct. Dec. 22, 1969) (differentiating between contracts which "expressly" incorporate rules of an arbitration association and those that are merely "subject to" or which "adopt" those rules; the latter is "ineffectual" to render arbitration the "exclusive remedy" (citing *Riverdale Fabrics Corp. v. Tillinghast-Stiles Co.*, 306 N.Y. 288 (1954) and *Level Export Corp. v. Wolz, Aiken & Co.*, 305 N.Y. 82 (1953))).

background law.'" (quoting *Northrop Grumman Info. Tech., Inc. v. U.S.*, 535 F.3d 1339, 1345 (Fed. Cir. 2008))).  The incidental reference to the Priority Provisions in Part 5(i) in the Swap Schedules hardly constitutes such clear and explicit language.

### D.   The Second Circuit Cases Cited by the Bankruptcy Court for a Broad Interpretation of Safe Harbors Did Not Involve § 560 and Are Inapposite

The Bankruptcy Court attempted to justify its broad reading of § 560 by relying on Second Circuit cases that applied another safe harbor, § 546(e).  *See* A849.[27]  While the Second Circuit has considered the reach of § 546(e) on numerous occasions, it has never addressed § 560.  *See, e.g.*, *In re Tribune Fraudulent Conveyance Litig.*, 818 F.3d 98 (2d Cir. 2016); *Ida Fishman*, 773 F.3d 411; *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329 (2d Cir. 2011); *In re Quebecor World (USA) Inc.*, 719 F.3d 94 (2d Cir. 2013).  Importantly, none of the Court of Appeals' § 546(e) decisions endorse a departure from the plain meaning rule in application of any statutory safe harbor.  While the Second Circuit has endorsed a broad reading of § 546(e), that is explainable by that statute's use of the exceptionally broadly defined term "settlement payment,"

---

[27] A number of recent cases have questioned the propriety of reading the safe harbors overbroadly.  *See FTI Consulting, Inc. v. Merit Mgmt. Grp., LP*, 830 F.3d 690 (7th Cir. 2016); *PAH Litig. Trust v. Water Street Healthcare Partners L.P. (In re Physiotherapy Holdings, Inc.)*, 2016 WL 3611831 (Bankr. Del. June 20, 2016).

which § 560 does not use.  Use of "settlement payment," a phrase whose definition is virtually limitless, necessarily results in a broad reading of § 546(e).  Section 560, on the other hand, does not contain the same defined terms or protect the same activities as § 546(e), and uses terms that are substantially less broad in their reach.

Indeed, as discussed above, the one published decision in this district interpreting the reach of § 560 affirmed Judge Peck's ruling that the scope of § 560 is limited, which is inconsistent with the expansive reach of § 560 adopted by the Bankruptcy Court below.  *See Swedbank AB (PUBL)*, 445 B.R. at 137.

## III.   ALL THE PRIORITY PROVISIONS ARE UNENFORCEABLE *IPSO FACTO* CLAUSES

The Opinion undermines the anti-*ipso facto* doctrine by treating two groups of clauses in the Indentures differently, even though they have indistinguishable effects and essentially identical language.  Before the Bankruptcy Code's enactment in 1978, *ipso facto* clauses were enforceable, although they were disfavored and subject to invalidation on equitable grounds.  *Queens Boulevard Wine & Liquor Corp. v. Blum*, 503 F.2d 202, 206-07 (2d Cir. 1974).  The Bankruptcy Code changed this by enacting §§ 365(e), 541(c) and 363(l), which together comprehensively reflect Congressional intent to render *ipso facto* clauses unenforceable.  H.R. Rep. No. 95-595, at 348-49 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6304-05; *see also* S. Rep. No. 95-989, at 59 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5845.

40

To effectuate the strong policy against enforcement of *ipso facto* clauses, the Bankruptcy Court should have looked at the substance of the provisions to determine whether they are prohibited. *See F.D.I.C. v. Bank of N.Y.*, 479 F. Supp. 2d 1, 18 (D.D.C. 2007), *aff'd*, 508 F.3d 1 (D.C. Cir. 2007). Courts have invalidated contractual provisions as *ipso facto* clauses if they were de facto *ipso facto* clauses or where the "practical effect," "substance" or "practical purpose" of the clause was to alter a debtor's rights due to a bankruptcy. *Ins. Co. of N. Am. v. NGC Settlement Trust & Asbestos Claims Mgmt. Corp.*, 118 F.3d 1056, 1067 n.18 (5th Cir. 1997); *In re Manning*, 831 F.2d 205, 211-12 (10th Cir. 1987). The Bankruptcy Court should have done so here because in all of the CDOs, LBSF lost its right to billions of dollars solely because of the filing of a bankruptcy.

A.   Minor Wording Differences Among the
     Priority Provisions Had No Substantive Effect
     and No Bearing on Whether the Provisions Are *Ipso Facto* Clauses

The Bankruptcy Court articulated an independent basis to dismiss the *ipso facto* claims in the Type 2 deals by finding that the requisite modification of rights did not occur in those deals, (A835), based on its erroneous conclusion that LBSF never had a right to payment priority in Type 2 deals. A837. The Bankruptcy Court found this distinction to be outcome-determinative on the issue of the application of the *ipso facto* doctrine, holding that while LBSF's rights were modified in Type 1 deals, no modification of rights occurred in Type 2 deals. This

conclusion cannot stand, as there is no substantive difference in the meaning or effect of the relevant language used in either Type 1 or Type 2 deals.  In the Opinion, the Bankruptcy Court ignored that LBSF's right to payment was changed solely because of a bankruptcy.

Aside from the fact that LBSF's right to payment under the Swaps was created long before Termination, the Bankruptcy Court's attempt to distinguish between different types of Priority Provisions cannot withstand analysis.  The linchpin of the Type 1/Type 2 distinction is the unsupportable conclusion that there is a meaningful difference in the language of the Priority Provisions in Type 1 and Type 2 deals.  But all of the Indentures have Priority Provisions granting LBSF the right to payment ahead of the Noteholders on Termination.  That payment right was fixed when the Indentures were executed and delivered, and was modified only because LBSF became the Defaulting Party.

In the Ruby Finance 2005-1 CDO, a Type 1 deal in which modification was held to have occurred, the relevant Indenture language states:

> The Trustee shall apply all moneys received by it under this Deed in connection with the realisation or enforcement of the Mortgaged Property as follows: Swap Counterparty [i.e. LBSF] Priority *unless* (i) an Event of Default (as defined in the Swap Agreement) occurs under the Swap Agreement and the Swap Counterparty is the Defaulting Party.

A798, § 5.5 (emphasis added).

This language is substantively indistinguishable from the relevant language used in Type 2 deals, where the Priority Provisions provide that:

> [T]he Trustee shall disburse amounts . . . in accordance with the following priorities . . .: (iii) On the Early Termination Payment Date . . . (B) *if* the Credit Swap Counterparty [LBSF] *is not* the Defaulting Party . . . to pay to the Credit Swap Counterparty all termination payments owed . . . under the Credit Swaps.

*See, e.g.*, A753-54, § 5(a)(iii) (emphasis added).

There is simply no legally cognizable difference between use of the words "if . . . not" in the Type 2 Priority Provisions and "unless" in the Type 1 Priority Provisions. Indeed, the word "unless" means the same thing as "if . . . not." *Cincinnati Newspaper Guild, Local 9 v. Cincinnati Enquirer, Inc.*, 863 F.2d 439, 446 (6th Cir. 1988) (dictionary definition of "unless" includes "if . . . not").[28] The Type 1/Type 2 distinction is flatly inconsistent with both the meaning of the words used in, and the substance and effect of, the Priority Provisions in both types of

---

[28] Both the words "if" and "unless" indicate the existence of condition precedents, *i.e.*, contingencies. *MHR Capital Partners LP v. Presstek, Inc.*, 12 N.Y.3d 640, 645, 912 N.E.2d 43, 47 (2009) (words such as "'if,' 'unless' and 'until' constitutes 'unmistakable language of condition'"); *DirectTV Latin Am., LLC v. RCTV Int'l Corp.*, 115 A.D.3d 539, 540 (1st Dep't 2014) ("tell-tale signs of a condition precedent" include the words "if," "until" and "unless").

43

Indentures.  In both cases, LBSF was deprived of an immensely valuable asset solely because of a default caused by the filing of a bankruptcy petition.[29]

Section 365(e)(1) renders unenforceable contractual provisions which modify or terminate "any right" because of a bankruptcy filing.  LBSF's rights under the Swaps were clearly modified; in fact, LBSF's positions went from being worth billions to being worth zero, solely because its parent filed bankruptcy.  In both Type 1 and Type 2 deals,[30] on Termination LBSF has the right to payment above the Noteholders (1) unless it was the party defaulting under the Swap, or (2) if it was not in default under the Swap, which are indistinguishable in meaning and effect.  Because the filing of a bankruptcy was the default that led to the

---

[29] Evidence would have shown that both types of clauses have the same effect; namely they modify a valuable right to priority solely due to the commencement of a bankruptcy case.  *See* A576-83.  Indeed, in the notices the Trustee issued in Type 2 deals, such as 801 Grand, the Trustee noted that LBSF's right to be paid between $36,713,000 and $45,208,797 was modified and LBSF would be paid zero— because of the application of the Priority Provisions.  *See* A585-88; *see also* A592-96; A599-601; A603-06, A607-11; A614.

[30] To the extent there is ambiguity in the meaning of the language used in the Type 1 and Type 2 Priority Provisions, it was improper for the Bankruptcy Court to ignore LBSF's well pleaded allegations that modifications occurred in all deals and to decide a mixed question of law and fact on the Motion.  *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 235 (2d Cir. 2014).  For purposes of the Motion, LBSF was entitled to a finding that all Priority Provisions operated identically in their effect on LBSF's rights to be paid on Termination under Second Method

modification of LBSF's rights, the modification of rights based on that default is unenforceable under Bankruptcy Code § 365(e).[31]

      **B.**    **The Bankruptcy Court's Holding that**
                    **Modification Occurred on Termination Misreads the Contracts**

Application of the § 365(e)(1) *ipso facto* provisions requires that modifications of rights must occur after a bankruptcy case is filed. The Bankruptcy Court erroneously held that modification occurred on Termination, rather than distribution of the Collateral (which in the Pre-Post[32] deals occurred after October 3, 2008).[33] A838-39.

_____

[31] The Bankruptcy Court compounded its error by ruling that LBSF does not allege that its right to payment was "modified." A846. This is flatly incorrect, as the Complaint repeatedly alleges that LBSF's right to payment was modified, reducing its right to payment from billions in the aggregate to zero. *See* A158-59, ¶¶ 2-3; A160, ¶ 7; A172, ¶ 56; A173-74, ¶¶ 61-62; A181, ¶ 84; A206, ¶ 179.

[32] In briefing the Motion, all parties referred to transactions based upon when (a) the swap was terminated, and (b) the Collateral was distributed, both in relation to the date of LBSF's bankruptcy filing. Where both the Termination and distribution occurred before the LBSF filing, the transaction was referred to as "Pre-Pre," where the Termination occurred before the LBSF filing and the distribution occurred after the LBSF filing, the transaction was referred to as "Pre-Post," and where the Termination and distribution occurred after the LBSF filing, the transaction was referred to as "Post-Post." However, the only basis for the Bankruptcy Court's findings (A822-23) as to occurrence of the Termination date or distribution date in any particular CDO was Appendix A to Movants' brief, an inappropriate basis to make such a finding

[33] Reversal of the finding that modification occurred on the date of early Termination would mean that the modifications took place after the LBSF Petition Date cases in the Pre-Post deals.

In deciding that Termination, rather than application of the Priority Provisions, was the event causing modification, the Bankruptcy Court rejected Judge Peck's contrary conclusions in *BNY* and *Ballyrock*.  A844-47.  In *BNY*, Judge Peck held that even if the Swap termination occurred before LBSF's petition date, LBSF's rights were not modified until the Priority Provisions were employed by the Trustee, i.e., when proceeds of Collateral were distributed.  *BNY*, 422 B.R. at 420-21.  In *Ballyrock*, in which Termination occurred prior to the LBSF Petition Date but distribution under the Priority Provisions occurred after such date, Judge Peck reiterated his *BNY* decision, finding that the modification occurred post-petition, even though Termination occurred pre-petition.  *See Ballyrock*, 452 B.R. at 34-36, 39.

The Transaction Documents themselves defeat the Bankruptcy Court's conclusion that modification occurred on Termination "and not upon the subsequent sale and distribution of the Collateral proceeds."  A845.  Termination entitled LBSF to payment, as § 6(e) of the Swap Agreements requires calculation of Loss after Termination for default, and Second Method requires that LBSF be paid the amount of the Issuers' negative Loss even if it is in default.  A446-47, § 6(e).  Nothing in the Transaction Documents supports the Bankruptcy Court's finding that Termination itself also modified that payment right.  The modification of LBSF's payment right could not, and did not, occur until the Priority Provisions

46

in the Indentures were applied, subordinating LBSF's right to payment under Second Method.

The Bankruptcy Court's conclusion that application of the Priority Provisions was effective on Termination relies on its finding that the Priority Provisions were "immediately and fully enforceable" on the Termination date. A874.  This conclusion is unsustainable, however, as a number of steps were required to be taken between Termination and permissible application of the Priority Provisions, most notably a required five business day delay.  Payments under the Priority Provisions may not be made until the Early Termination Payment Date, and that date is at least five business days after Termination.  *See* A735, § 2; A753-54, § 5(a)(iii).[34]  In addition, before the Priority Provisions could be applied, calculation of Loss, the sale of the Collateral and generation of Collections all had to occur.  *See* A735-37, § 2; 753-54, § 5(a)(iii).  Sale of the Collateral is a prerequisite to distribution under the Priority Provisions on Termination, since "Collections" must be received before Distribution can be made

---

[34] Under ISDA § 6(a), the Non-Defaulting Party can fix an Early Termination Date after default.  A445.  That results in the deemed issuance of an Enforcement Notice under Standard Terms § 5.2(a).  A663-64.  The Early Termination Payment Date is defined in the Series Indenture as the fifth Business Day following the deemed delivery of an Enforcement Notice.  A735

under the Priority Provisions.[35]  *See* A624, § 1.1 A735-36, A737, § 2; A753-54, §

5(a)(iii).  Accordingly, the Bankruptcy Court's finding that the Priority Provisions

were "immediately and fully enforceable" is irreconcilable with the contracts.

A847.  Judge Peck correctly concluded in *BNY* that modification had not occurred

upon Termination because the requisite number of business days between

Termination and Priority Provision application had not elapsed, the amount of Loss

had not been calculated, Collateral had not been liquidated, and Collections had

not yet been received on Termination.  *See BNY*, 422 B.R. at 418.  The Bankruptcy

Court's holding that Termination caused modification of rights is simply wrong.

   C.   The LBHI Petition Date is the Proper Date for the
        Purposes of Application of the *Ipso Facto* Provisions of the Code

   The Bankruptcy Court improperly held that modifications occurring after the

LBHI Petition Date but before the LBSF Petition Date did not violate § 365(e).

A838-47.  In doing so, the Bankruptcy Court misinterpreted the *ipso facto*

prohibitions in the Bankruptcy Code and disregarded Judge Peck's well-reasoned

prior holdings.

---

[35] "On the Early Termination Payment Date . . . Collections received . . . will be
allocated and applied in the following order of priority."  A753-54, § 5(a)(iii).  The
Indenture defines Principal Collections to include the liquidation proceeds of the
Collateral.

### 1. The LBHI Bankruptcy Filing is the Case After Which Modification of Rights Were Prohibited

Section 365 uses two similar phrases.  The section uses "commencement of **the** case" in (e)(1), and "commencement of **a** case" in (e)(1)(B).  11 U.S.C. § 365(e)(1).  The timing issue turns on whether "the case," after which modifications must occur, is only the case of the debtor counterparty LBSF, or, as Judge Peck held in *BNY* and *Ballyrock*, the case of LBHI, its parent whose earlier filing made LBSF's bankruptcy inevitable.  *See BNY*, 422 B.R. at 420; *Ballyrock*, 452 B.R. at 40.  In addition to § 365, there are two other anti-*ipso facto* provisions of the Code, §§ 363(l) and 541(c), neither of which uses "the case" language and which bear on this determination, but the Bankruptcy Court misread both of those sections in the Opinion which undermines its analysis.  *See* 11 U.S.C. §§ 363(l), 365(e), 541(c); A839.

Both §§ 363(l) and 541(c) render *ipso facto* provisions unenforceable under the circumstances described therein.  The Opinion states that §§ 363(l) and 541(c)(1) both use the words "*the* case," (A842), but in fact, neither of those sections contain that phrase.  Section 363(l) uses the language "the commencement of *a* case under this title *concerning the debtor*," in invalidating limitations on the use of property.  The actual language of § 363(l) thus supports an interpretation that the case in question triggering anti-*ipso facto* protections does not have to be a case of the debtor counterparty, but only must *concern* the debtor counterparty, as

49

LBHI's case concerned LBSF.  Moreover, the use of the article "a" rather than "the" in § 363(l) also supports treating LBHI's case as the case after which modifications are prohibited.  Similarly, and contrary to the Bankruptcy Court's reading, § 541(c)(1) does not use the words "the case" either; § 541(c)(1)(B) uses the term "a case" describing an offending *ipso facto* clause.

Treating "the case" after which modifications must occur under § 365(e)(1) as LBHI's case recognizes the strong policy against enforcement of *ipso facto* clauses.  Indeed, the disdain for *ipso facto* clauses led courts to create an equitable exception to their enforcement even when they were not statutorily prohibited under the Bankruptcy Act of 1938.  *Queens Boulevard Wine & Liquor Corp.*, 503 F.2d at 206-07.  Judge Peck's determination that modifications occurring after the LBHI Petition Date are prohibited on the facts of this case comports with the language and intent of the statute and rectifies an unjust result where Noteholders received windfalls at the expense of LBSF's creditors.  The misreading of §§ 363 and 541 in the Opinion requires reversal and remand.

> ### 2.   *As Judge Peck Previously Held, the LBHI and LBSF Bankruptcy Filings Constituted a "Singular Event" for Purposes of Application of the Ipso Facto Provisions of the Code*

In *BNY*, a trustee of a special purpose vehicle sought to deprive LBSF of a termination payment under a swap in reliance on a payment priority flip triggered by LBHI's bankruptcy filing.  *BNY*, 422 B.R. at 413-14.  Applying §§ 365(e)(1)

and 541(c)(1)(B), Judge Peck held that the priority flip was an unenforceable *ipso facto* clause that could not abrogate LBSF's right created under Second Method to receive a termination payment, and that any attempt to enforce such provisions would violate the automatic stay.  *Id.* at 415, 420-22.

Although the priority shift in *BNY* occurred after the LBSF Petition Date, Judge Peck held that the payment priority modification was an invalid *ipso facto* clause even if it were triggered by LBHI's earlier filing, because "the chapter 11 cases of LBHI and its affiliates is a singular event for purposes of interpreting [the] *ipso facto* language" of §§ 365(e)(1) and 541(c)(1)(B).  *Id.* at 420.  In *Ballyrock*, where termination occurred before LBSF's petition date but distribution occurred after, Judge Peck held that the "flip clause" at issue was an *ipso facto* clause, explaining that "sections [365 and 541] are broadly worded and protect a debtor from the operation of a clause triggered by not only its own bankruptcy filing but also by the bankruptcy of a related entity."  *Ballyrock*, 452 B.R. at 39.  The Bankruptcy Code's plain language, relevant legislative history, Judge Peck's knowledge of the *sui generis* Lehman Chapter 11 filing, and a sound policy rationale all support Judge Peck's holding that LBSF's bankruptcy was a "singular event" with LBHI's filing.

In *BNY*, Judge Peck cited his sixteen months of experience (at that time) in presiding over the Lehman bankruptcy, concluding that the various Lehman

entities "compris[ed] an integrated enterprise and, as a general matter, the financial condition of one affiliate affects the others." 422 B.R. at 420 (internal quotation marks and citation omitted). Judge Peck also emphasized the "sheer size of the corporate family" and the "emergency, unplanned nature of the Debtors' bankruptcy cases" and concluded that, "[u]nder these circumstances, the first filing at the holding company level of the corporate structure has significance, especially in the context of the *ipso facto* provisions that speak in terms of the commencement of 'a' case under this title." *Id.*

Judge Peck's "singular event" holding reflects the sound bankruptcy policy that a successful reorganization requires the debtor to maintain its valuable contracts. In complex modern corporate structures, a debtor needs protection, not just against modifications to its contracts based on its own bankruptcy filing, but also against modifications triggered by an affiliate's bankruptcy filing—especially the filing of the debtor's corporate parent, a point other courts recognize. *See JPMorgan Chase Bank, N.A. v. Charter Commc'ns Op., LLC (In re Charter Commc'ns)*, 419 B.R. 221, 251 (Bankr. S.D.N.Y. 2009) (Peck, J.), *aff'd*, 691 F.3d 476 (2d Cir. 2012); *Sigmon v. Goldman Sachs Mortg. Co.*, 539 B.R. 221, 230 (S.D.N.Y. 2015). Otherwise, parties could contract around important *ipso facto* prohibitions by causing the loss of contractual rights to occur on the bankruptcy filing of a debtor's parent or affiliate, a result at odds with the purpose of the anti-

*ipso facto* provisions to preserve valuable contract rights of distressed businesses from termination solely because of bankruptcy.

In *BNY*, Judge Peck based his decision that the LBHI filing date controls for purposes of § 365 on the Debtors' complex business structure as well as the unprecedented circumstances prevailing in September 2008 which required a hasty filing of LBHI's petition with virtually no time to prepare for it. *BNY*, 422 B.R. at 420. As Judge Crotty found, this singular event issue presents "a mixed question of law and fact," (*Lehman Bros. Special Fin. Inc.*, 2011 WL 9375423, at *4), and therefore should not be determined on a motion to dismiss.

## IV.   LBSF'S STATE LAW CLAIMS SHOULD BE RESTORED

In addition to the bankruptcy claims addressed above, LBSF also asserted state law claims for (i) unjust enrichment, (ii) constructive trust, (iii) money had and received, and (iv) replevin in Counts XIII-XVI, breach of contract against the Trustees in Count XVII, intentional fraud and constructive fraudulent transfers by the Issuers under the NY DCL in Count XVIII, and sought a declaration that the Priority Provisions constitute an unenforceable penalty under New York law in Count XIX.

First, the Bankruptcy Court dismissed Counts XIII through XVII based solely on its determinations that the Priority Provisions were not unenforceable *ipso facto* provisions and/or its application of the § 560 safe harbor. *See* A858 ("In

light of the foregoing . . . the Court concludes that LBSF's state law claims also fail to state a cause of action . . .") and A860 (dismissing contract claim against the Trustees (Count XVII)).  Accordingly, if this Court reverses on the *ipso facto* and § 560 issues, then it should reinstate Counts XIII through XVII.  *Carpenters Pension Trust Fund of St. Louis*, 750 F.3d at 236.

The Bankruptcy Court dismissed Count XVIII, alleging constructive and intentional fraudulent transfer claims by LBSF as creditor of the Issuers under NY DCL §§ 273, 274, 278 and 279, concluding that the Noteholders gave fair consideration because those payments did not violate the anti-*ipso facto* provisions and thus do not constitute payment of a junior debt due to the Notes ahead of a senior debt due to LBSF on Termination, as LBSF alleged.  A861-62.  If this Court reverses the ruling that distributions were immune from challenge under the anti-*ipso facto* provisions, then it should remand with respect to the determination that fair consideration was given, since the equivalence of consideration would be called into question.  Equivalence of consideration is a fact issue and inappropriate for resolution on a motion to dismiss.  *In re Actrade Fin. Tech. Ltd.*, 337 B.R. 791, 803 (Bankr. S.D.N.Y. 2005).  Moreover, determination of whether the transferee acted with the requisite good faith also cannot be made on a motion to dismiss. *In re Bernard L. Madoff Inv. Sec., LLC*, 440 B.R. 243, 256 (Bankr. S.D.N.Y. 2010);

*HBE Leasing Corp. v. Frank*, 61 F.3d 1054, 1061 (2d Cir. 1995); *Sardis v. Frankel*, 113 A.D.3d 135, 142-44, 978 N.Y.S.2d 135, 141-43 (1st Dep't 2014).

In addition, citing a single Complaint paragraph, the Bankruptcy Court wrongly concluded that LBSF alleged badges of fraud "predicated on the Trustees' knowledge that distributions to the Noteholders would be invalid under the Code," (A862), and that those allegations fail since the distributions were immune and did not violate the Code.  Reversal is required because the Bankruptcy Court did not properly defer to paragraphs 286-291 of the Complaint alleging, *inter alia*, the close relationship between the Trustees and Issuers; questionable, hasty and out of the ordinary course transfers; the pattern of transactions designed to move the Issuers' assets from creditors, including LBSF; the Issuers' inability to satisfy secured claims; the Issuers' inadequate capitalization; and the Trustees' dominion and control of the Issuers in the Transaction documents, Collateral and proceeds. The Bankruptcy Court failed to consider LBSF's allegations that the Trustees acted to hinder or delay LBSF's creditors, instead just focusing on LBSF's allegations of fraud.  *See* A227-32, ¶¶ 275-296.  In doing so, the Bankruptcy Court disregarded that the test for whether a transfer was made with "actual intent to hinder, delay, or defraud creditors," is disjunctive and LBSF was not required to prove all three objective tests.  *In re Jacobs*, 394 B.R. 646, 658 (E.D.N.Y. 2008).

Finally, the Bankruptcy Court also erred in dismissing Count XIX, which seeks a declaration that the Priority Provisions constitute an invalid penalty under state law irrespective of the Court's conclusion on the *ipso facto* and § 560 issues. Ultimately, relying on *Drexel Burnham Lambert Prod. Corp. v. Midland Bank PLC*, 1992 U.S. Dist. LEXIS 21223, at *4 (S.D.N.Y. Nov. 9, 1992), the Bankruptcy Court dismissed the claim, asserting that *Drexel* had facts similar to the present case.  Unlike this case in which no discovery or factual development has occurred, *Drexel* was a summary judgment decision in which the facts had been fully developed.  Among other things, *Drexel* relied on the fact that a party was merely "forego[ing] an unrealized investment gain."  *Id.*  No factual record here supports a comparable conclusion, and any factual inferences at this stage should have been construed in LBSF's favor.  Accordingly, Count XIX to declare the Priority Provisions invalid should not have been dismissed before the development of a factual record.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Bankruptcy Court's order dismissing Counts I through XIX of the Fourth Amended Complaint be reversed and the case remanded to the Bankruptcy Court for further proceedings.

Dated:     New York, New York
            April 10, 2017

By:  /s/ Paul R. DeFilippo
     William A. Maher
     Paul R. DeFilippo
     William F. Dahill
     Vincent T. Chang
     Mara R. Lieber
     Nicholas G. Veliky

WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
(212) 382-3300
*Counsel for Plaintiff Lehman Brothers*
*Special Financing Inc.*

By: /s/ Thomas E. Hommel
    Thomas E. Hommel

LEHMAN BROTHERS HOLDINGS INC.
1271 Avenue of the Americas
New York, New York 10020
(646) 285-9000

*Counsel for Lehman Brothers*
*Special Financing Inc.* against AIG, Inc. and
AIG Taiwan Insurance Co. Ltd.

## <u>CERTIFICATE OF COMPLIANCE</u>

Based on the word counting device used in my computer program, I hereby certify that:

1.     This brief complies with the word limit requirement set forth in Fed. R. Bankr. P. Rule 8015(a)(7)(B)(i), because it contains 13,957 words, excluding the parts of the brief exempted by Fed. R. Bankr. P. Rule 8015(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. Bankr. P. Rule 8015(a)(5) and the type style requirements of Fed. R. Bankr. P. Rule 8015 (a)(6), because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman type style.

Dated:  New York, New York
           April 10, 2017

By:     /s/ Paul R. DeFilippo
          Paul R. DeFilippo
          WOLLMUTH MAHER & DEUTSCH LLP
          500 Fifth Avenue
          New York, New York 10110
          (212) 382-3300
          *Counsel for Plaintiff Lehman Brothers*
          *Special Financing Inc.*