|  | USDC SDNY<br>DOCUMENT<br>ELECTRONICALLY FILED<br>DOC #:_____<br>DATE FILED: 3/14/18 |
|---|---|

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
In re:

LEHMAN BROTHERS HOLDINGS INC.,
et al.,

                    Debtors.

------------------------------------------------------X

LEHMAN BROTHERS SPECIAL
FINANCING INC.,

                    Appellant,

                -against-

BANK OF AMERICA NATIONAL
ASSOCIATION, et al.
                  Appellees.

------------------------------------------------------X

17 Civ. 1224 (LGS)

**OPINION AND ORDER**

LORNA G. SCHOFIELD, District Judge:

      Appellant Lehman Brothers Special Financing Inc. ("LBSF") appeals the Bankruptcy Court's Memorandum Decision ("Opinion"), *In re Lehman Bros. Holdings Inc*., 553 B.R. 476 (Bankr S.D.N.Y. 2016), granting Noteholder Defendants-Appellees' omnibus motion to dismiss Counts I through XIX of the Fourth Amended Complaint (the "Complaint") in this adversary proceeding. The Bankruptcy Court's decision is affirmed.

**I.    BACKGROUND**

      Familiarity with the facts and procedural history is assumed. The following facts are taken from the Complaint and the contracts integral thereto, and are accepted as true for the purpose of this appeal, and all inferences are drawn in favor of LBSF, the Plaintiff and non-

moving party below. *See Littlejohn v. City of New York*, 795 F.3d 297, 306-07 (2d Cir. 2015). The facts are summarized below only as necessary to resolve the issues on appeal.

At issue in this case are forty-four synthetic collateralized debt obligation ("CDO") transactions (the "Transactions") that LBSF and its affiliates ("Lehman") structured, negotiated, and marketed. In each Transaction, Lehman established a special purpose vehicle (the "Issuer") that marketed notes issued to investors (the "Noteholders") pursuant to indenture or trust agreements. The Issuer used the proceeds from the notes to acquire certain liquid investments to serve as collateral (the "Collateral"). Each Issuer also entered into one or more swap agreements with LBSF, whereby the Issuer sold LBSF credit protection against the default of certain third-party reference entities. LBSF made regular payments to the Issuer, which the Issuer used to supplement periodic interest payments made to the Noteholders. If the reference entities experienced certain "Credit Events" while the swap agreement was in effect, the Issuer could owe LBSF payment from the Collateral.

The Collateral was held in trust by a trustee or similar financial agent ("Trustee") pursuant to an indenture, a trust deed, or a trust agreement. The Trustee held a lien on the Collateral for the benefit of all secured parties, primarily the Noteholders and LBSF,[1] and controlled certain of the Issuer's rights under the Transaction documents. In each of these Transactions, LBSF and the Noteholders held competing interests in the Collateral. The Transaction documents include provisions that determine the priority of payment upon a distribution of proceeds from the liquidation of the Collateral after the termination of the swap (the "Priority Provisions").

---

[1] In addition to the Noteholders and LBSF, secured parties for a Transaction typically included the Trustees themselves and specified providers of administrative, custodial or similar services.

In each Transaction, the swaps and issuances to noteholders were documented separately, though each swap and indenture that form part of the same Transaction makes reference to the other. If an event of default occurs under an indenture, the Trustees are entitled to issue an enforcement notice ("Termination Notice"), which accelerates payment due on the notes and triggers an early termination of the swaps. While a Termination Notice terminates the swap, it does not terminate the indenture. After issuing a Termination Notice, the Trustee is permitted, but not required, to liquidate the Collateral. If the Trustee liquidates the Collateral and distributes the proceeds, the Trustee is required to make distributions according to the payment priority order applicable under the Priority Provisions.

Each swap was documented with an ISDA Master Agreement, schedules, and a confirmation. The schedule to the ISDA Master Agreement provides the method for calculating any termination payment due following an early termination date upon the occurrence of an "Event of Default" (as defined in the swap) by either LBSF or the Issuer. A party whose swap position has value at the time of termination is considered "in-the-money."

The Transaction documents provided that any distributions made by the Trustee were to be made in accordance with the Priority Provisions. Under the Priority Provisions, LBSF held payment priority for a termination payment ahead of the Noteholders under certain circumstances, while in other circumstances, the Noteholders held payment priority over LBSF. In an early termination, the Priority Provisions directed payment of the Collateral proceeds to the non-defaulting party first. If a Transaction was terminated early due to an Issuer default and LBSF was in-the-money, LBSF had a priority claim over the Noteholders for a termination payment from Collateral proceeds. On the other hand, if terminated early due to an LBSF default, including if LBSF or its ultimate parent company Lehman Brothers Holdings Inc.

("LBHI") filed a bankruptcy case, the Issuer could unwind the Transaction and repay the Noteholders before LBSF.

LBHI filed for bankruptcy on September 15, 2008, triggering an Event of Default whereby LBSF was the defaulting party under the swap for each Transaction. LBSF filed its bankruptcy petition on October 3, 2008. In each Transaction, the Issuer, through the Trustee, designated an Early Termination Date under the swaps and delivered Termination Notices, terminating the swaps and accelerating the amount due on the notes. The Trustees then liquidated the Collateral and distributed the proceeds pursuant to the Priority Provisions. The Trustees prioritized the Noteholders above LBSF because the early terminations resulted from an Event of Default and LBSF was the defaulting party. The proceeds of the liquidation of the Collateral were insufficient to make any payment to LBSF after proceeds were paid to the Noteholders.

## II.     SUMMARY OF THE OPINION

The Complaint alleges that the Priority Provisions are unenforceable *ipso facto* clauses because they modify a debtor's contractual right solely due to a bankruptcy filing, violating sections 365(e)(1), 541(c)(1)(B) and 363(l) of the Bankruptcy Code. The Complaint also alleges that any attempt to modify its payment priority violates the automatic stay, 11 U.S.C. § 362(a)(3), because such an attempt improperly seeks to exercise control over the property of LBSF's estate. The Complaint asserts additional claims under the Bankruptcy Code and New York law in connection with the purported modification of its payment priority. Counts I – XII bring claims under the Bankruptcy Code, and Counts XIII through XIX bring claims under state law.

The Opinion dismisses Counts I through XIX of the Complaint for failure to state a claim.[2] The ruling on the bankruptcy law claims rests on three independent bases. First, the Opinion groups the Transactions into two categories: "Type 1" and "Type 2" Transactions. The Opinion finds that the Priority Provisions in the five Type 1 Transactions modified LBSF's rights due to the filing of its bankruptcy case and therefore are *ipso facto* clauses. Based on different contractual language, the Opinion finds that Type 2 Transactions did not modify LBSF's rights due to its bankruptcy case, and therefore are not *ipso facto* clauses. The Complaint thus fails to state a claim as to Type 2 Transactions.

Second, the Opinion finds in the alternative that even though the Priority Provisions in the Type 2 Transactions are *ipso facto* clauses, any modification of LBSF's rights took place at the time of early termination. Because the prohibitions on *ipso facto* clauses only invalidate modifications of rights that occur after the filing of a bankruptcy case, such prohibitions did not apply to Transactions whose early termination preceded LBSF's bankruptcy. The Complaint thus fails to state a claim as to Transactions that were terminated prior to LBSF's filing for bankruptcy, which happened to include all but two of the Type 2 Transactions.

Third, the Opinion reasons that even if the Priority Provisions are *ipso facto* clauses, they are nonetheless enforceable because § 560 of the Bankruptcy Code provides a safe harbor for the termination and liquidation of swap agreements, exempting them from the Bankruptcy Code's *ipso facto* prohibitions.

---

[2] In addition to the Counts asserted against Defendants-Appellees with respect to all Transactions, in Counts XX-XXVI, LBSF asserted breach of contract claims involving specific Transactions. The Opinion does not address these counts, which are thus not subject to the current appeal.

5

The Opinion also dismisses LBSF's state law claims because the distributions at issue were not improper, nor was LBSF deprived of any property or contractual right.

**III. STANDARD**

An appellate court reviews *de novo* a grant of a motion to dismiss. *Deutsche Bank Nat'l Trust Co. v. Quicken Loans Inc.*, 810 F.3d 861, 865 (2d Cir. 2015). *See also In re Charter Commc'ns, Inc.*, 691 F.3d 476, 483 (2d Cir. 2012) (when reviewing a bankruptcy court's decision, the district court reviews legal conclusions de novo).

Federal Rule of Bankruptcy Procedure 7012(b), which incorporates Federal Rule of Civil Procedure 12(b)(6), permits a bankruptcy court to dismiss an adversary proceeding if a plaintiff's complaint fails to state a claim upon which relief may be granted. On a motion to dismiss, a court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in favor of the non-moving party, *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016), but gives "no effect to legal conclusions couched as factual allegations," *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 35 (2d Cir. 2017). To withstand a motion to dismiss, a pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

In deciding a Rule 12(b)(6) motion, the court may not consider evidence proffered by a party. The court is limited to reviewing the complaint, any documents attached to that pleading or incorporated in it by reference, any documents heavily relied upon by the complaint as to their "terms and effect" and which are therefore integral to the plaintiff's allegations even if not

explicitly incorporated by reference, and facts of which the court may take judicial notice. *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).

## IV. DISCUSSION

The Bankruptcy Court correctly determined that the safe harbor provision for swap agreements under Section 560 of the Bankruptcy Code protects the distributions of the Collateral under the Priority Provisions. The Bankruptcy Court also correctly concluded that the state law claims fail as a matter of law, primarily because the Priority Provisions do not violate the Bankruptcy Code. Thus, the Opinion's dismissal of LBSF's Counts I through XII under the Bankruptcy Code and Counts XIII to XIX under state law is affirmed.

### A. The Section 560 Safe Harbor and the Federal Bankruptcy Claims

#### 1. The Section 560 Safe Harbor

Under the Bankruptcy Code, *ipso facto* clauses -- contract provisions that modify the rights of the debtor due to filing for bankruptcy -- are generally unenforceable. Section 365(e) of the Code provides:

> an executory contract . . . of the debtor may not be terminated or modified, and any right or obligation under such contract . . . may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract . . . that is conditioned on . . . the commencement of a case under this title[.]

11 U.S.C. § 365(e)(1).

Section 541 also effectively invalidates *ipso facto* clauses by providing that a debtor's interest in property

> becomes property of the estate . . . notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law . . . that is conditioned on . . . the commencement of a case under this title . . . and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property.

7

11 U.S.C. § 541(c)(1).

Finally, § 363(l) preserves the right of the trustee or a bankruptcy plan to use property of the estate for the bankruptcy estate

> notwithstanding any provision in a contract, a lease, or applicable law that is conditioned . . . on the commencement of a case under this title concerning the debtor . . . and that effects, or gives an option to effect, a forfeiture, modification, or termination of the debtor's interest in such property.

11 U.S.C. § 363(l).

Citing these statutory requirements, the Complaint alleges that the Priority Provisions are unenforceable *ipso facto* provisions because they downgrade LBSF's right to collect from the proceeds of the Collateral as a result of LBHI's or LBSF's filing for bankruptcy.

Section 560 of the Code provides a safe harbor protecting a swap participant's right to unwind a swap transaction pursuant to an *ipso facto* clause that otherwise would be unenforceable. The provision states:

> The exercise of any contractual right of any swap participant or financial participant to cause the liquidation, termination, or acceleration of one or more swap agreements because of a condition of the kind specified in section 365(e)(1) of this title . . . shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by order of a court . . . in any proceeding under this title.

11 U.S.C. § 560. Assuming that the Priority Provisions are *ipso facto* clauses, they are protected by the § 560 safe harbor.

In interpreting § 560, the Court bears in mind fundamental principles of statutory interpretation. "As in any statutory construction case, we start, of course, with the statutory text, and proceed from the understanding that unless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning." *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013) (internal quotation marks omitted). "Statutory language cannot be construed in a

vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Sturgeon v. Frost*, 136 S. Ct. 1061, 1070 (2016) (internal quotation marks omitted). Where a statute's text is "ambiguous and [its] structure fails to remove the ambiguity, we turn to legislative history." *Marblegate Asset Mgmt., LLC v. Educ. Mgmt. Fin. Corp.*, 846 F.3d 1, 8 (2d Cir. 2017).

As confirmed by the legislative history, the purpose of § 560 is to protect securities markets from the disruptive effects that unwinding swap transactions in bankruptcy would cause. *See Whyte v. Barclays Bank PLC*, 494 B.R. 196, 200 (S.D.N.Y. 2013), *aff'd*, 644 F. App'x 60 (2d Cir. 2016) (analyzing the purpose of 11 U.S.C. § 546(g), another safe harbor for swap agreements enacted in the same legislation as § 560); *In re Bd. of Directors of Compania Gen. de Combustibles S.A.*, 269 B.R. 104, 113 (Bankr. S.D.N.Y. 2001) (In enacting the swap transaction provisions of the Bankruptcy Code, Congress "was seeking to ensure access to the swap market for United States borrowers and stabilize United States domestic markets."); *Thrifty Oil Co. v. Bank of Am. Nat. Tr. & Sav. Ass'n*, 322 F.3d 1039, 1050 (9th Cir. 2003) ("The legislative history of the Swap Amendments plainly reveals that Congress recognized the growing importance of interest rate swaps and sought to immunize the swap market from the legal risks of bankruptcy.").

In 1990, Congress introduced the § 560 safe harbor in a bill intended "to ensure that the swap and forward contract financial markets are not destabilized by uncertainties regarding the treatment of their financial instruments under the Bankruptcy Code," H.R. Rep. No.101-484, at 1 (1990), and to address "concerns regarding volatility in the swap market," *id.* at 2-3; *accord* 136 Cong. Rec. H2281, 2283 (May 15, 1990) (remarks of Rep. Fish) ("The swap market serves essential functions today – including reducing vulnerability to fluctuations in exchange and

9

interest rates. Explicit Bankruptcy Code references to swap agreements will remove ambiguities that undermine the swap market."); 136 Cong. Rec. S7535 (1990) (remarks of Sen. DeConcini) ("The effect of the swap provisions will be to provide certainty for swap transactions and thereby stabilize domestic markets by allowing the terms of the swap agreement to apply notwithstanding the bankruptcy filing."). The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 (2005), again amended the Bankruptcy Code to further expand the protection of swap participants by adopting an "extremely broad" definition of swap agreements to "protect[] *all* counterparties to these agreements." *In re Nat'l Gas Distributors, LLC*, 556 F.3d 247, 253 (4th Cir. 2009).

### 2. Application of § 560 to this Case

As stated above, the § 560 safe harbor provides:

> The exercise of any contractual right of any swap participant or financial participant to cause the liquidation, termination, or acceleration of one or more swap agreements because of a condition of the kind specified in section 365(e)(1) of this title . . . shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by order of a court . . . in any proceeding under this title.

Bearing in mind the provision's purpose of protecting the financial markets from uncertainty due to the risk of swap agreements not being honored in bankruptcy, the most sensible literal reading of § 560 applies to the distributions at issue in this case. Enforcing the Priority Provisions was the "exercise of [a] contractual right . . . to cause the liquidation [or] termination" of the swap component of each Transaction. And even though actual enforcement of the Priority Provisions fell on Trustees as agents of the Issuers, such enforcement was nonetheless a right "of" the Issuers, who are "swap participants" under the safe harbor.

### i. Definition of "Liquidation" or "Termination"

Section 560 protects "the exercise of any contractual right . . . to cause the liquidation [or] termination" of a swap agreement. The text of the Bankruptcy Code safe harbors must be interpreted based on their plain meaning, subject only to the limitations present in the express language of the relevant provision. *See, e.g.*, *In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d 411, 421–22 (2d Cir. 2014) (rejecting a Ponzi scheme exception to the safe harbor of § 546(e), finding that Ponzi scheme payments were made "in connection with" a securities contract under the meaning of the provision even if these payments were not required by the contract).

The Code does not define "liquidation," but legal, financial and general dictionaries define "liquidate" to mean bringing an undertaking to an end and paying or distributing its assets. For example, Black's Law Dictionary offers six definitions of "liquidate":

> **1.** To settle (an obligation) by payment or other adjustment; to extinguish (a debt). **2.** To ascertain the precise amount of (debt, damages, etc.) by litigation or agreement. **3.** To determine the liabilities and distribute the assets of (an entity), esp. in bankruptcy or dissolution. **4.** To convert (a nonliquid asset) into cash. **5.** To wind up the affairs of (a corporation, business, etc.). **6.** *Slang*. To get rid of (a person), esp. by killing.

*Liquidate*, Black's Law Dictionary (10th ed. 2014). All of these definitions except the last one sensibly apply to the liquidation of a swap agreement. Similarly, Merriam-Webster defines "liquidate" as:

> **1 a** (1) : to determine by agreement or by litigation the precise amount of (indebtedness, damages, or accounts) (2) : to determine the liabilities . . . and apportion assets toward discharging the indebtedness of; **b** : to settle (a debt) by payment or other settlement . . .
> **2** *archaic* : to make clear
> **3** : to do away with especially by killing . . .
> **4** : to convert (assets) into cash . . .

*Liquidate*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/liquidate (last visited Mar. 7, 2018). Again, all these definitions except definition 3 potentially apply to swap

11

agreements. In the context of this case, the plain meaning of liquidate means to bring the swap agreement to an end by distributing the Collateral pursuant to the Priority Provisions.

LBSF asserts that the word "liquidation" as used in § 560 means only the *calculation* of amounts owed upon termination of a swap, and does not include the actual disbursement of those amounts under the Priority Provisions. LBSF therefore concludes that the distribution of funds under the Priority Provisions was not an exercise of a right to cause the "liquidation, termination, or acceleration" of a swap agreement protected by § 560.

LBSF's interpretation is unpersuasive because it is limited to one definition of "liquidation" to the exclusion of others that are more fitting in this context. In analyzing the text of a statute, courts "look to both the language itself and the specific context in which that language is used." *Merit Management Group, LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 893 (2018). LBSF's interpretation is rejected because it is based on an interpretation of the term "liquidation" in the context of an "unliquidated" -- *i.e.*, uncalculated -- claim or amount, or in terms of converting an illiquid asset to cash, and not in the context of the liquidation of an agreement, specifically a swap agreement. But the § 560 safe harbor is not concerned with unliquidated or unascertained amounts and the need to ascertain them. Rather, § 560 is concerned with bringing swap agreements to an end and distributing the collateral.

LBSF's definition also is nonsensical because it would nullify any protection § 560 provides to swap agreements. A mere calculation of amounts owed provides no security to swap participants if they will not be able to collect on those debts. *See, e.g.*, *Whyte*, 494 B.R. at 199 (rejecting interpretation of § 546(g) that would render it a nullity, producing an "absurd result").

As Bankruptcy Judge Peck explained in *Michigan State Housing Development Authority v. LBSF (In re Lehman Bros. Holdings Inc.)*, 502 B.R. 383 (Bankr. S.D.N.Y. 2013) ("*Michigan*

12

*Housing*"), "liquidation" under § 560 can occur only "following the liquidation methodology specified in the swap agreement." *Id.* at 393. "Unless the act of liquidation is performed in accordance with some agreed method, the right to liquidate is disconnected and loses all practical meaning." *Id.* at 394. As noted in the Opinion, "here, it is clear that the Priority Provisions are either explicitly set forth in the schedules to the ISDA Master Agreements or are incorporated into such schedules from the Indentures." The sole agreed-upon method for settling the parties' obligations under the swap is set forth in the Priority Provisions.

LBSF also asserts that the Opinion is inconsistent with prior case law. Primarily, LBSF argues that the Opinion is inconsistent with Judge Peck's rulings in *LBSF v. BNY Corporate Trustee Services Ltd. (In re Lehman Bros. Holdings Inc.)*, 422 B.R. 407 (Bankr. S.D.N.Y. 2010) ("*BNY*"), and *LBSF v. Ballyrock ABS CDO 2007-1 Ltd. (In re Lehman Bros. Holdings Inc.)*, 452 B.R. 31 (Bankr. S.D.N.Y. 2011) ("*Ballyrock*"). In those cases, Judge Peck ruled that the safe harbors did not protect the priority provisions at issue. This argument is unavailing, first, because the cases LBSF relies on are not controlling authority. Second, *BNY* is distinguishable because, unlike here, the provisions at issue were not part of the swap agreement. *See Michigan Housing*, 502 B.R. at 395 (explaining that unlike in *BNY*, the provisions governing liquidation were "part of the swap agreement at issue"). Third, Judge Peck's more recent opinion in *Michigan Housing* holds that § 560 protects the contractual right to "calculate the Settlement Amount" due under the swap and notes that "the plain meaning of [§ 560] protects both the act of liquidating and the manner for carrying it out." 502 B.R. at 395.

### ii. Defining the Rights "of . . . Swap Participant[s]"

Section 560 applies only to the exercise of a contractual right held by either a "swap participant" or a "financial participant" under the Bankruptcy Code. As explained in the

Opinion, enforcement of the Priority Provisions was a right held by the Issuers, who are indisputably "swap participants." As defined in the Code, a "swap participant" is "an entity that, at any time before the filing of the petition, has an outstanding swap agreement with the debtor." 11 U.S.C. § 101(B)(53C). Each Issuer was a party to a swap and thus meets the definition of "swap participant." The transaction documents confer upon the Issuers, along with the Trustees, the right to terminate the swaps and liquidate and distribute the funds.[3]

LBSF argues that the Issuers had no contractual rights after default to enforce the Priority Provisions and seek distribution of the funds. According to LBSF, only the Trustees held and exercised that right pursuant to the indentures, and the Trustees are not swap or financial participants under the Code. The Court is not aware of relevant authority directly addressing this issue, but nonetheless concludes that LBSF's argument is incorrect and contrary to the plain language of the statute. Section 560 requires only the exercise "of" a swap participant's contractual right, but that right need not be exercised "by" the swap participant.

That the Trustees exercised the rights to enforce the Priority Provisions does not mean that these are not rights belonging to or "of" the Issuers. *Cf. In re Tribune Co. Fraudulent Conveyance Litig.*, 818 F.3d 98, 121 (2d Cir. 2016) ("The broad language used in Section 546(e) [a safe harbor protecting securities transactions] protects transactions rather than firms, reflecting a purpose of enhancing the efficiency of securities markets in order to reduce the cost of capital to the American economy."). The Collateral was an asset of the Issuer, purchased with funds

---

[3] For instance, Section 10.1(d) of the Indenture for the 801 Grand CDO Transaction provides: "If at any time the Credit Swaps become subject to early termination due to the occurrence of an Event of Default or a Termination Event (each as defined in the Credit Swaps), the Issuer and the Trustee shall take such actions . . . to enforce the rights of the Issuer and the Trustee thereunder as may be permitted by the terms of such agreement and consistent with the terms hereof, and shall apply the proceeds of any such actions to Principal Collections."

14

from the Noteholders, which the Issuer pledged to secure its obligations to LBSF and the Noteholders. The Issuers contracted with LBSF for the right to terminate the transactions and use the Collateral to pay off Noteholder obligations before LBSF in the event LBSF defaulted under the terms of the swap. With LBSF's consent, the Issuers assigned the right to distribute the Collateral according to the Priority Provisions to the Trustees.[4] Thus, when the Trustees terminated the swaps and enforced the Priority Provisions, they exercised the rights "of" the Issuers.

### B. LBSF's State Law Claims

The Opinion is correct to dismiss the state law claims at issue here, which are in Counts XIII through XIX. Counts XIII – XVII assert claims for unjust enrichment, constructive trust, money had and received, replevin and breach of contract. These claims fail as a matter of law because the distributions were not improper, nor was LBSF deprived of its property in light of the holding above that the Priority Provisions were not unenforceable *ipso facto* clauses.

Count XVIII asserts that the distributions from the Issuer to the Noteholders were constructive and intentional fraudulent transfers under New York's Uniform Fraudulent Conveyance Act ("NY UFCA"). To establish such claims, a party must prove, among other things, that the transferor did not receive "fair consideration," which is given when "an antecedent debt is satisfied" in good faith. N.Y. Debt & Cred. Law § 272. The payments to the Noteholders were indisputably a repayment of debt the Issuers owed the Noteholders under an arm's length contract. Thus, these transfers were for "fair consideration." *See Sharp Int'l Corp.*

---

[4] For example, Section 7.7 of the Indenture for the 801 Grand CDO Transaction provides: "The Issuer hereby irrevocably and by way of security designates the Trustee, its agent and attorney-in-fact to execute any . . . instrument required pursuant to this Section 7.7. . . . The Issuer shall enforce all of its material rights and remedies under the Credit Swaps."

*v. State Street Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 54-55, 56 (2d Cir. 2005) (dismissing constructive and intentional fraudulent transfer claims where transfer merely satisfied preexisting debt).

Count XIX seeks a declaratory judgment that the Priority Provisions operate as unenforceable penalties under New York law. The penalty doctrine applies only to liquidated damages clauses. *See, e.g.*, *172 Van Duzer Realty Corp. v. Globe Alumni Student Assistance Ass'n, Inc.*, 24 N.Y.3d 528, 536 (N.Y. 2014). As explained in the Opinion, the Priority Provisions cannot qualify as a penalty because they "do[] not fix damages, but instead eliminate[] the right to receive funds that would have been distributed to LBSF absent a default." A swap agreement provision denying an in-the-money defaulting party recovery is "neither a penalty, a forfeiture, nor an unjust enrichment" because it merely requires a party to "forego an unrealized investment gain." *Drexel Burnham Lambert Prod. Corp. v. Midland Bank PLC*, No. 92 Civ. 3098, 1992 WL 12633422, at *2 (S.D.N.Y. Nov. 10, 1992).

## V. CONCLUSION

The judgment of the Bankruptcy Court is AFFIRMED. The Clerk of Court is directed to close the case.

Dated: March 14, 2018
       New York, New York

                                                      **LORNA G. SCHOFIELD**
                                                 **UNITED STATES DISTRICT JUDGE**